GEORGE RUNDLE AND WILLIAM GRIFFITHS, TRUSTEES OF THE ESTATE OF JOHN SAVAGE, DECEASED, PLAINTIFFS IN ERROR, *v.* THE DELAWARE AND RARITAN CANAL COMPANY.

By the law of Pennsylvania, the River Delaware is a public navigable river, held by its joint sovereigns in trust for the public.

Riparian owners, in that State, have no title to the river, or any right to divert its waters, unless by license from the States.

Such license is revocable, and in subjection to the superior right of the State, to divert the water for public improvements, either by the State directly, or by a corporation created for that purpose.

The proviso to the provincial acts of Pennsylvania and New Jersey, of 1771, does not operate as a grant of the usufruct of the waters of the river to Adam Hoops and his assigns, but only as a license, or toleration of his dam.

As, by the laws of his own State, the plaintiff could have no remedy against a corporation authorized to take the whole waters of the river for the purpose of canals, or improving the navigation, so, neither can he sustain a suit against a corporation created by New Jersey for the same purpose, who have taken part of the waters.

The plaintiffs being but tenants at sufferance in the usufruct of the water to the two States who own the river as tenants in common, are not in a condition to question the relative rights of either to use its waters without consent of the other.

This case is not intended to decide whether a first licensee, for private emolument, can support an action against a later licensee of either sovereign or both, who, for private purposes, diverts the water to the injury of the first.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the District of New Jersey.

The facts in the case are set forth in the opinion of the court.

It was argued in print by *Mr. Ashmead* and *Mr. Vroom* for the plaintiffs in error, and by *Mr. John M. Read* orally, for the defendants in error. There was also a printed argument upon the same side, submitted by himself and *Mr. Green.*

The arguments, upon both sides, contained historical accounts of the legislation of Pennsylvania and New Jersey on the subject of the River Delaware, and the various compacts and negotiations between them. It is impossible, in the report of a law case, to give an explanation of these transactions, commencing before the Revolution. Those who may have occasion to investigate the matter minutely, would do well to obtain from the counsel their respective arguments. All that will be attempted,

in this report, will be to give an account of the points which were made.

The declaration charged the Canal Company with having,

1. Erected a dam in the River Delaware, above the works of the plaintiffs, and, by means of it, obstructed and penned up the waters of the river.

2. With digging a canal, and diverting the waters of the river into it, and so leading them into the State of New Jersey.

3. With cutting off the streams and brooks which theretofore had been tributary to the said River Delaware, and preventing them from flowing into it.

4. With using the waters, taken from the river, to supply the said canal, and to create a water power, from which they supply various mills, manufactories, and other establishments, with water, for the sake of gain.

The judgment of the court upon the demurrer being that the plaintiffs had no right of action, the counsel for the plaintiffs in this court assumed the following as the grounds upon which the court below founded its decision, which grounds they severally contested.

The points ruled in the court below, and of which the plaintiffs complain as being erroneous, are:

1. That the authority under which the dam of Adam Hoops has been kept and maintained in the River Delaware, since the year 1771, was not a grant, but a license, revokable at the pleasure of New Jersey alone, and, at best, impunity for a nuisance.

2. That the plaintiffs, who claim as the assignees of Adam Hoops, for the diversion of the water from their mills, cannot recover, because their works are situated in the State of Pennsylvania, and not in New Jersey, and that the claim for damages must be regulated by the rule established by the Pennsylvania courts, which rule is opposed to the one recognized in the State of New Jersey, and applied by the Supreme Court to these defendants in error in a similar case.

3. That it is not competent for the plaintiffs to question the authority of New Jersey, to take the waters of the Delaware for her public improvements, without the consent of Pennsylvania.

*First Point.* With respect to the first point, the counsel for the plaintiffs in error contended,

1. That the said acts were, in form, substance, and legal effect, a grant, and not a license. They then commented on the acts, and cited the following authorities:

An authority given, will operate by way of license or grant, according to its nature and the intention of the parties. Thus, in 15 Viner's Ab. Tit. Lease, (N.) Pl. 1, it is said, " That if a

man license me to enter into his land, and to occupy it for a year, half year, or such like, this is a lease and shall be so pleaded." A confirmation of a title by act of Congress, (which was the least effect to be given to the acts of 1771 and 1804,) not only renders it a legal title, but furnishes higher evidence of that fact than a patent, inasmuch as it is a direct, whereas a patent is only the act of its ministerial officer. Grignon's Lessee *v.* Astor, 2 Howard, 319; Sims *v.* Irvine, 3 Dallas, 425; Patton *v.* Easton, 1 Wheaton, 476; Strother *v.* Lucas, 12 Peters, 410. In this latter case, at page 454, it is said by Judge Baldwin, delivering the opinion of the court, "that a grant may be made by a law, as well as a patent pursuant to a law, is undoubted, 6 Cr. 128; and a confirmation by a law, is as fully, to all intents and purposes, a grant, as if it contained in terms a grant *de novo*."

2. If the acts of 1771 are to be regarded as a technical license, such license is not revocable by the parties granting it, or either of them, it being a license not executory, but executed, on the faith of which large expenditures had been incurred, previous to the alleged revocation by the State of New Jersey, in 1830, by the passage of the act chartering the Delaware and Raritan Canal.

The authorities are clear and conclusive, that a license by one man to another, to make use of his land for purposes requiring expenditures of money, and contemplating permanence, is, in effect a grant, and is not revocable in its nature. Thus, in Rerick *v.* Kern, 14 S. & Rawle, 267, it is said that, "permission to use water for a mill, or or any thing else that was viewed by the parties as a permanent erection, will be of unlimited duration and survive the erection itself, if it should be destroyed, or fall into a state of dilapidation." Although a license executory may be revoked, yet a license executed cannot be. Winter *v.* Brockwell, 8 East, 308. Lord Ellenborough says, in this case, "that he thought it unreasonable, that, after a party had been led to incur expense, in consequence of having obtained a license from another to do an act, and that the license had been entered upon, that either should be permitted to recall his license." In Taylor *v.* Waters, 7 Taunton, 374, it is decided that a license granted on consideration cannot be revoked Liggins *v.* Inge, 7 Bingham, 682, (20 English Com. Law. 287,) decides that where the plaintiff's father, by oral license, permitted the defendant to lower the bank of a river, and to make a weir above the plaintiff's mill, whereby less water than before flowed to the plaintiff's mill, the plaintiff could not sue the defendants for continuing the weir; the court holding that the license in that case, being executed, was not countermandable

by the party who gave it. So, in Wood *v.* Manly, 11 Adol. & Ellis, 34, (39 Eng. Com. Law 19,) it was held that a license to enter upon land to take away property purchased thereon, was part of the consideration of the purchase, and could not be revoked. The case of Webb *v.* Paternoster, (Palmer, 151,) asserts the general principle, that an executed license is not countermandable. Rerick *v.* Kern, (14 S. & Rawle, 267,) was the case of a license to use a water power, given without any consideration, and held not revocable. The court said the license " was a direct encouragement to spend money," and " it would be against all conscience to annul it," and further, that " the execution of it would be specifically enjoined; and that the party to whom the license was granted would not be turned round to his remedy for damages." " How very inadequate it would be, in a case like this," says the court, " is perceived by considering that a license, which has been followed by the expenditure of ten thousand dollars, as a necessary qualification for the enjoyment of it, may be revoked by an obstinate man who is not worth as many cents." Again, it is remarked — " having had in view an unlimited enjoyment of the privilege, the grantee has purchased, by the expenditure of money, a right indefinite in point of duration."

3. If the joint acts of 1771 and 1804, are ever to be regarded as a revocable license, and not as a grant, such license has never been actually revoked by both or either of the State legislatures. The act of 1830, by which the Delaware and Raritan Canal Company was chartered by the State of New Jersey, contains no such provision, and a revocation by implication will not be inferred where so great a wrong would be perpetrated on an individual.

4. Admitting that the State of New Jersey, by the act chartering the Delaware and Raritan Canal Company, intended to revoke the grant or executed license made to Adam Hoops, and those claiming under him, it was incompetent for that State to do so.

If the joint act of the legislatures of the two States be a grant, or, what is the same in legal effect, an executed license, then that grant or executed license is a contract within the meaning of the constitution, and cannot be impaired by subsequent legislation. Fletcher *v.* Peck, 6 Cranch, 87 ; Terret *v.* Taylor, 9 Cranch, 43. Where a legislature has once made a grant, it is as much estopped by it as is an individual. Such a grant amounts to an extinguishment of the right of the grantor, and a contract not to reassert that right. *Id.* It is a principle applicable to every grant that it cannot effect preëxisting titles. Although a grant is conclusive on its face, and cannot be con-

troverted, yet if the thing granted is not in the grantor, no right passes to the grantee. City of New Orleans *v*. Armas, 9 Peters, 224; New Orleans *v*. United States, 10 Peters, 662; Lindsey Lessee of Miller, 6 Peters, 666.

Again: If the franchise and privileges, secured to the plaintiffs by the joint acts of 1771, are the subject of legislative revocation, the revocation must certainly be as extensive as the license accorded. It must, to be effectual, be the joint act of both legislatures, and not the separate act of either. Pennsylvania was no party to the charter granted by New Jersey to the defendants. Indeed, she refused to become such, on the terms proposed by her. In many respects, this case resembles that of the Chesapeake and Ohio Canal Company *v*. The Baltimore and Ohio Railroad Company, 4 Gill & Johns. 1. This was the case of a contest between the plaintiffs, who claimed under the joint acts of the States of Maryland and Virginia and the United States, and the defendants, who claimed part of the same franchise under a separate act of the State of Maryland. It was held, that neither Maryland nor Virginia, without the consent of the other, could impair a charter granted by their previous joint legislation, nor could they do so even jointly.

*Second Point.* The second proposition ruled by the learned Judge below, was, that the plaintiffs, who claim as the assignees of Adam Hoops, for the diversion of the water from their mills, cannot recover, because their works are situated in the State of Pennsylvania, and not in New Jersey, and that the claim for damages must be regulated by the Pennsylvania courts, which rule is opposed to the one recognized in the State of New Jersey, and applied by the Supreme Court to these defendants in error in a similar case.

1. The accuracy of this position is denied; because the action, having been instituted in the Circuit Court of New Jersey, against a New Jersey corporation, to recover damages consequent upon the erection of a public work exclusively within her own soil, the laws of New Jersey and the decisions of its Supreme Court, must furnish the rule of decision as to the extent of the liability of this corporation for the act complained of, and not the laws and decisions of Pennsylvania, as to the liability of Pennsylvania corporations.

2. If the plaintiffs' claim for damages is to be regulated by the decisions in Pennsylvania, there is no case of binding authority in the adjudications of Pennsylvania, which rules this point against them; the doctrine not going to the extent supposed by the learned Judge.

*Third Point.* The third point ruled by the learned Judge below, is, "that it is not competent for the plaintiffs to question

the authority of New Jersey to take the waters of the Delaware River for her public improvements, without the consent of Pennsylvania, the chennel and waters of this river being vested in the two States, as tenants in common, and no one can question the authority of either to divert the water, but the other."

(These points were examined and contested.)

It has been before mentioned, that the briefs of the counsel contained references to numerous historical documents. That filed on the part of the defendants in error was very elaborate, and *Mr. Read* referred to them in his oral argument. The summing up was as follows:

We have thus presented a chronological detail of the history of the Delaware, and of the legislative negotiation, and executive action of both States in relation to the river, its navigation, and the various uses of its water for canal or mill purposes; and we think it can leave no doubt, in any dispassionate mind, that the plaintiffs in error have no title whatever to claim damages from the Delaware and Raritan Canal Company, for taking water from the river for the use of its canal, under a direct and positive authority granted by the legislature of New Jersey.

Adam Hoops's dam, uniting the main land with Bird's Island, and extending from the head of it into the main channel of the river, and perhaps one other dam on the Pennsylvania side, were erected by the owners of the fast land, prior to 1771, without any authority whatever, either from the crown, or the provincial government. Now, these erections being in the river, and beyond the low-water mark, whether the tide ebbed and flowed there or not, or whether the river was then vested in the crown or the proprietaries, were, by the unquestioned law of Pennsylvania, nuisances, and could have been abated by individuals, and certainly by the authorized agents of the government.

The law of Pennsylvania is well stated by Mr. Justice Grier, in this case. "But the law of Pennsylvania," says the learned Judge, "by which the title and rights of the plaintiffs must be tested, differs materially from that of England and most of the other States of the Union. As regards her large fresh-water rivers, she has adopted the principles of the civil law, in p ;ference to that of England." Rundle *v.* Delaware and Raritan Canal Company, Wallace, Jr. 297.

In the case of Carson *v.* Blazer, the Supreme Court of that State, decided that the large rivers, such as the Susquehanna and Delaware, were never deemed subject to the common law of England applicable to fresh-water streams; but they are to be treated as "navigable rivers;" that the grants of William Penn, the proprietary, never extended beyond the margin of the

river, which belonged to the public; and that the riparian
owners have, therefore, no exclusive right to the soil or water
of such river, *ad filum medium aquæ.*

These principles are fully sustained by all the Pennsylvania
cases down to the present time, which are cited below, and
which also exemplify the doctrine that mere tolerations or
licenses on navigable streams, are always in the power of the
sovereign, and can be withdrawn, at any moment, without any
violation of the constitutional provision.

These nuisances were in existence at the passage of the act
of 9th March, 1771, and, under its general terms, the commis-
sioners named in it, would have been obliged to abate them at
once, as artificial obstructions to the navigation, except for the
proviso in the 7th section, which prohibits the commissioners,
therein appointed, from removing or altering the same. The
same observation applies to the New Jersey act of the same
year.

"But," to use again the language of the learned Judge be-
low, "we can discover nothing in the nature of a grant in the
words of this proviso. It amounts to no more than the present
toleration of a nuisance, previously erected, or, at most, to a
license revocable at pleasure. The doctrine of the cases which
we have just quoted, applies to it with full force and conclu-
sive effect; nor can the plaintiff claim by prescription against
the public for more than the act confers on him, which, at best,
is but an impunity for a nuisance." 2, Binn. 475; Brown *v.*
Commonwealth, 3 S. & R. 273; Shrunk *v.* Schuylkill Naviga-
tion Co. 14 S. & R. 71; Bacon *v.* Arthur, 4 Watts, 437; Cou-
vert *v.* O'Connor, 8 Watts, 470; Ball *v.* Slack, 2 Wharton, 508,
538; Monongahela Nav. Co. *v.* Coons, 6 W. & S. 101; Sus-
quehanna Canal Co. *v.* Wright, 9 Id. 9; Commonwealth *v.*
Church, 1 Barr, 105; Fisher *v.* Carter, 1 Wallace, Jr. 69; Mayor
*v.* Commissioners of Spring Gardens, 7 Barr, 348; Reading *v.*
Commonwealth, 1 Jones, 201; M'Kinney *v.* Monongahela Nav.
Co. 2 Harris, 66; Henry *v.* Pittsburg, 8 W. & S. 85; O'Connor
*v.* Pittsburg, Sept. 1851, MS.; Wallace, Jr. 300, 301.

But if there be any doubt on this subject, it is removed by a
reference to the agreement of 26th April, 1783, between the two
sovereign States of New Jersey and Pennsylvania, then recog-
nizing no common superior, and not affected by any provision
afterwards contained in the Constitution of the United States.

The acts of 1771 were temporary in their character, and all
operations under them ceased from the commencement of the
Revolutionary War. The compact of 1783, which is perpetual
in its operation, declared "the River Delaware, from the station
point, or north-west corner of New Jersey northerly, to the place

Rundle et al. *v.* Delaware and Raritan Canal Company.

upon the said river where the circular boundary of the State of Delaware toucheth upon the same, in the whole length and breadth thereof, is, and shall continue to be and remain a common highway, equally free and open for the use, benefit, and advantage of the said contracting parties."

Such language admits of no dispute. It is a complete and total revocation of all license or toleration, or grant of any kind to any dams or works erected on the Pennsylvania or Jersey side of the river, which were nuisances *ab origine.*

It cannot be supposed that two or more original nuisances were saved out of the general and comprehensive terms of the compact, and that they are, to subsist to all future time as obstacles to any use of the river, by either or both States, which may in any manner affect the works thus placed on the soil and in the waters of the public.

This view is supported by the unbroken legislation of Pennsylvania particularly — by the ground taken by her commissioners in 1817, and virtually recognized by those of New Jersey, and by the subsequent agreements of 1829 and 1834, entered into by the commissioners of both States, which treated these works as nuisances, and as not to be regarded in any disposition to be made of the waters of the river, whether by the erection of dams, or for the supply of canal or water power.

They were in fact treated as if they had no legal existence. Can such a title give a claim for damages upon a company incorporated by a sovereign State of the confederacy?

It is also clearly " not competent for the plaintiffs to question the authority of New Jersey to take the waters of the Delaware for her public improvements, without the consent of Pennsylvania. The channel and waters of this river are vested in the two States, as tenants in common, as we have already seen ; and no one can question the authority of either to divert its waters but the other. Pennsylvania was the first to seize on a portion of their joint property, for her separate use, and is estopped by her own act from complaint against New Jersey, who has but followed her example. Besides this, mutual consent may be presumed from mutual acquiescence. At all events, the plaintiff, who is shown to have no title to the river, or any part of it, and whose toleration or license could at best only protect him from a prosecution, is not in a situation to dispute the rights of either, or claim compensation for a diversion of its waters, for the purpose of the public improvements of either of its sovereign owners."

Mr. Justice GRIER delivered the opinion of the court.

The plaintiffs in error, who were plaintiffs below, are owners

of certain mills in Pennsylvania, opposite to the city of Trenton, in New Jersey. These mills are supplied with water from the Delaware River, by means of a dam extending from the Pennsylvania shore to an island lying near and parallel to it, and extending along the rapids to the head of tide water.

The plaintiffs, in their declaration, show title to the property under one Adam Hoops, who had erected his mill and built a dam in the river previous to the year 1771. In that year, the Provinces of Pennsylvania and New Jersey, respectively, passed acts declaring the River Delaware a common highway for purposes of navigation up and down the same, and mutually appointing commissioners to improve the navigation thereof, with full power and authority to remove any obstructions whatsoever, natural or artificial; and subjecting to fine and imprisonment any person who should set up, repair, or maintain any dam or obstruction in the same, provided, " that nothing herein contained shall give any power or authority to the commissioners herein appointed, or any of them, to remove, throw down, lower, impair, or in any manner to alter a mill-dam erected by Adam Hoops, Esq., in the said River Delaware, between his plantation and an island in the said river, nearly opposite to Trenton; or any mill-dam erected by any other person or persons in the said river, before the passing of this act, nor to obstruct, or in any manner to hinder the said Adam Hoops, or such other person or persons, his or their heirs and assigns, from maintaining, raising, or repairing the said dams respectively, or from taking water out of the said river for the use of the said mills and waterworks erected as aforesaid, and none other."

The declaration avers, that by these acts of the provincial legislatures, the said Hoops, his heirs and assigns, became entitled to the free and uninterrupted enjoyment and privilege of the River Delaware for the use of the said mills, &c., without diminution or alteration by or from the act of said Provinces, now States of Pennsylvania and New Jersey, or any person or persons claiming under them or either of them. Nevertheless, that the defendants erected a dam in said river above plaintiffs' mills, and dug a canal and diverted the water, to the great injury, &c.

The defendants are a corporation, chartered by New Jersey, for the purpose of "constructing a canal from the waters of the Delaware to those of the Raritan, and of improving the navigation of said rivers." They admit the construction of the canal, and the diversion of the waters of the river for that purpose, but demur to the declaration, and set forth as causes of demurrer —

" That the act of the legislature of the then Province of Penn-

sylvania, passed March ninth, in the year of our Lord one thousand seven hundred and seventy-one, and the act of the then Province of New Jersey, passed December twenty-first, in the year of our Lord one thousand seven hundred and seventy-one, as set forth in said amended fifth count, do not vest in the said Adam Hoops, or in his heirs or assigns, the right and privilege to the use of the water of the River Delaware without diminution or alteration, by or from the act of the then Province, now State, of Pennsylvania, or of the then Province, now State, of New Jersey, or of any person or persons claiming under either of them, or of any person or persons whomsoever, as averred in the said amended fifth count of the said declaration. And also, for that it does not appear, from the said amended fifth count, that the same George Rundle and William Griffiths are entitled to the right and privilege to the use of the water of the River Delaware, in manner and form as they have averred in the said amended fifth count of their declaration.

"And also that, as it appears from the said amended fifth count, that the said River Delaware is a common highway and public navigable river, over which the States of Pennsylvania and New Jersey have concurrent jurisdiction, and a boundary of said States, these defendants insist that the legislative acts of the then Province of Pennsylvania and New Jersey, passed in the year of our Lord seventeen hundred and seventy-one, as set forth in the said amended fifth count, were intended to declare the said River Delaware a common highway, and for improving the navigation thereof, and that the provision therein contained, as to the mill-dam erected by Adam Hoops, in the said River Delaware, did not and does not amount to a grant or conveyance of water power to the said Adam Hoops, his heirs or assigns, or to a surrender of the public right in the waters of the said river, but to a permission only to obstruct the waters of the said river by the said dam, without being subjected to the penalties of nuisance; that the right of the said Adam Hoops was, and that of his assigns is, subordinate to the public right at the pleasure of the legislature of Pennsylvania and New Jersey, or either of them."

On this demurrer the court below gave judgment for the defendants, which is now alleged as error.

It is evident, that the extent of the plaintiff's rights as a riparian owner, and the question whether this proviso operates as the grant of a usufruct of the waters of the river, or only as a license or toleration of a nuisance, liable to revocation or subordinate to the paramount public right, must depend on the laws and customs of Pennsylvania, as expounded by her own courts. It will be proper, therefore, to give a brief sketch of

the public history of the river and the legislative action connected with it, as also of the principles of law affecting aquatic rights, as developed and established by the courts of that State.

The River Delaware is the well known boundary between the States of Pennsylvania and New Jersey. Below tide water, the river, its soil and islands, formerly belonged to the crown; above tide water, it was vested in the proprietaries of the coterminous provinces — each holding *ad medium filum aquæ.* Since the Revolution, the States have succeeded to the public rights both of the crown and the proprietaries. Immediately after the Revolution, these St ., entered into the compact of 1783, declaring the Delaware a common highway for the use of both, and ascertaining their respective jurisdiction over the same. For thirty years after this compact, they appear to have enjoyed their common property without dispute or collision. When the legislature of either State passed an act affecting it, they requested and obtained the concurrence and consent of the o her. Their first dispute was caused by an act of New Jersey, passed February 4, 1815, authorizing Coxe and others to erect a wing dam, and divert the water for the purpose of mills and other machinery. The consent of the State of Pennsylvania was not requested; it therefore called forth a protest from the legislature of that State. This was followed by further remonstrance in the following year. A proposition was made to submit the question of their respective rights to the Supreme Court of the United States, which was rejected by New Jersey. After numerous messages and remonstrances between the governors and legislatures, commissioners were mutually appointed to compromise the disputes. But they failed to bring the matter to an amicable conclusion. The dispute was never settled, and the wing dam remained in the river.

In 1824, New Jersey passed the first act for the incorporation of the Delaware and Raritan Canal Company, for which the company gave a bonus of $100,000. This act requires the consent of the State of Pennsylvania; and on application being made to her legislature, she clogged her consent with so many conditions, that New Jersey refused to accept her terms, returned the bonus to the company; and so the matter ended for that time.

Both parties then appointed commissioners to effect, if possible, some compact or arrangement by which each State should be authorized to divert so much water as would be necessary for these contemplated canals. After protracted negotiations, these commissioners finally (in 1834) agreed upon terms, but the compact proposed by them was never ratified by either party.

In the mean time, each State appropriated to itself as much of the waters of the river as suited its purpose.    In 1827 and 1828, Pennsylvania diverted the River Lehigh, a confluent of the Delaware, and afterwards, finding that stream insufficient, took additional feeders for her canal, out of the main stream of the Delaware.    On the 4th February, 1830, the legislature of New Jersey passed the act under which the defendants were incorporated, and in pursuance of which, they have constructed the dam and feeder, the subject of the present suit.

The canals in both States, supplied by the river, are intimately and extensively connected with their trade, revenues, and general property — while the navigation of the river above tide water, and the rapids at Trenton, is of comparatively trifling importance, being used only at times of the spring freshets, for floating timber down the stream, when the artificial diversions do not affect the navigation.    The practical benefits resulting to both parties, from their great public improvements, appear to have convinced them that further negotiations, complaints, or remonstrances, would be useless and unreasonable; and thus, by mutual acquiescence and tacit consent, the necessity of a more formal compact has been superseded.

The law of Pennsylvania, by which the title and rights of the plaintiffs must be tested, differs materially from that of England, and most of the other States of the Union.    As regards her large fresh-water rivers, she has adopted the principles of the civil law.    In the case of Carson *v.* Blazer, the Supreme Court of that State decided, that the large rivers, such as the Susquehanna and Delaware, were never deemed subject to the doctrines of the common law of England, applicable to fresh water streams, but that they are to be treated as navigable rivers; that the grants of William Penn, the proprietary, never extended beyond the margin of the river, which belonged to the public, and that the riparian owners have therefore no exclusive rights to the soil or water of such rivers *ad filum medium aquæ.*

In Shrunk *v.* The Schuylkill Navigation Company, the same court repeat the same doctrine; and Chief Justice Tilghman, in delivering the opinion of the court, observes: " Care seems to have been taken, from the beginning, to preserve the waters of these rivers for public uses, both of fishery and navigation; and the wisdom of that policy is now more striking than ever, from the great improvements in navigation, and others in contemplation, to effect which, it is necessary to obstruct the flow of the water, in some places, and in others to divert its course.    It is true that the State would have had a right to do these things for the public benefit, even if the rivers had been private property; but then, compensation must have been made to the

owners, the amount of which might have been so enormous as to have frustrated, or at least checked these noble undertakings."

In the case of The Monongahela Navigation Company *v.* Coons, the defendant had erected his mill under a license given by an act of the legislature (in 1803) to riparian owners to erect dams of a particular structure, " provided they did not impede the navigation," &c. The Monongahela Navigation Company, in pursuance of a charter granted them by the State, had erected a dam in the Monongahela, which flowed back the water on the. plaintiff's mill, in the Youghiogany, and greatly injured it. And it was adjudged by the court, that the Company were not liable for the consequential injury thus inflicted. The court, speaking of the rights of plaintiff, consequent on the license granted by the act, (of 1803,) observe: " That statute gave riparian owners liberty to erect dams of a particular structure, on navigable streams, without being indictable for a nuisance, and their exercise of it was, consequently, to be attended with expense and labor. But was this liberty to be perpetual, and forever tie up the power of the State? Or, is not the contrary to be inferred, from the nature of the license? So far was the legislature from seeming to abate one jot of the State's control, that it barely agreed not to prefer an indictment for a nuisance, except on the report of viewers to the Quarter Sessions. But the remission of a penalty is not a charter, and the alleged grant was nothing more than a mitigation of the penal law."

The case of the Susquehanna Canal Company *v.* Wright, confirms the preceding views, and decides, " that the State is never presumed to have parted with one of its franchises in the absence of conclusive proof of such an intention. Hence a license, accorded by a public law to a riparian owner, to erect a dam on the Susquehanna River, and conduct the water upon his land for his own private purposes, is subject to any future provision which the State may make, with regard to the navigation of the river. And if the State authorize a company to construct a canal which impairs the rights of such riparian owner, he is not entitled to recover damages from the company. In that case, Wright had erected valuable mills, under a license granted to him by the legislature; but the court say,—" He was bound to know that the State had power to revoke its license whenever the paramount interests of the public should require it. And, in this respect, a grant by a public agent of limited powers, and bound not to throw away the interests confided to it, is different from a grant by an individual who is master of the subject. To revoke the latter, after an expenditure in the prosecution of it, would be a fraud. But he who accepts a

license from the legislature, knowing that he is dealing with an agent bound by duty not to impair public rights, does so at his risk; and a voluntary expenditure on the foot of it, gives him no claim to compensation."

The principles asserted and established by these cases, are, perhaps, somewhat peculiar, but, as they affect rights to real property in the State of Pennsylvania, they must be treated as binding precedents in this court. It is clear, also, from the application of these principles to the construction of the proviso under consideration, that it cannot be construed as a grant of the waters of a public river for private use, or a fee-simple estate in the usufruct of them, "without diminution or alteration." It contains no direct words of grant, which would operate by way of estoppel upon the grantor. The dam of Adam Hoops was a nuisance when it was made; but, as it did little injury to the navigation, the commissioners, who were commanded to prostrate other nuisances, were enjoined to tolerate this. The mills of Hoops had not been erected on the faith of a legislative license, as in the cases we have quoted, and a total revocation of it would not be chargeable with the apparent hardship and injustice which might be imputed to it in those cases. His dam continues to be tolerated, and the license of diverting the water to his mills is still enjoyed, subject to occasional diminution from the exercise of the superior right of the sovereign. His interest in the water may be said to resemble a right of common, which by custom is subservient to the right of the lord of the soil; so that the lord may dig clay-pits, or empower others to do so, without leaving sufficient herbage on the common. Bateson *v.* Green, 5 T. R. 411.

Nor can the plaintiff claim by prescription against the public for more than the act confers on him, which is at best impunity for a nuisance. His license, or rather toleration, gives him a good title to keep up his dam and use the waters of the river, as against every one but the sovereign, and those diverting them by public authority, for public uses.

It is true, that the plaintiff's declaration in this case, alleges, that the waters diverted by defendants' dam and canal are used for the purpose of mills; and for private emolument. But as it is not alleged, or pretended, that defendants have taken more water than was necessary for the canal, or have constructed a canal of greater dimensions than they were authorized and obliged by the charter to make, this secondary use must be considered as merely incidental to the main object of their charter. We do not, therefore, consider the question before us, whether the plaintiff might not recover damages against an individual, or private corporation, diverting the water of this river

to their injury, for the purpose of private emolument only, with or without license, or authority of either of its sovereign owners. The case before us requires us only to decide, that by the laws of Pennsylvania, the River Delaware is a public, navigable river, held by its joint sovereigns, in trust, for the public; that riparian owners of land have no title to the river, or any right to divert its waters, unless by license from the State. That such license is revocable, and in subjection to the superior right of the State, to divert the water for public improvements.

It·follows, necessarily, from these conclusions, that, whether the State of Pennsylvania claim the whole river, or acknowledge the State of New Jersey, as tenant in common, and possessing equal rights with herself; and whether either State, without consent of the other, has or has not, a right to·divert the stream, it will not alter or enlarge the plaintiff's rights. Being a mere tenant at sufferance to both, as regards the usufruct of the water, he is not in a condition to question the relative rights of his superiors. If Pennsylvania chooses to acquiesce in this partition of the waters, for great public improvements, or is estopped to complain by her own acts, the plaintiff cannot complain, or call upon this court to decide questions between the two States, which neither of them sees fit to raise. By the law of his own State, the plaintiff has no remedy against a corporation authorized to take the whole river for the purpose of canals or improving the navigation; and his tenure and rights are the same as regards both the States.

With these views, it will be unnecessary to inquire whether the compact of 1783, between Pennsylvania and New Jersey, operated as a revocation of the license or toleration implied from the proviso of the colonial· acts of 1771, as that question can arise only in case the plaintiffs' dam be indicted as a public nuisance.

Nor is it necessary to pass any opinion on the question of the respective rights of either of these co-terminous States to whom this river belongs, to divert its waters, without the consent of the other.

The question raised is not without its difficulties; but being bound to resolve it by the peculiar laws of Pennsylvania, as interpreted by her own courts, we cannot say that the court below has erred in its exposition of them, and therefore affirm the judgment.

Mr. Justice McLEAN and Mr. Justice DANIEL dissented.

Mr. Justice CATRON gave a separate opinion; and Mr. Justice CURTIS dissented from the judgment of the court, on the merits, but not from its ent rtaining jurisdiction.

The following are the opinions of Mr. Justice CATRON and Mr. Justice DANIEL.

Mr. Justice CATRON.

My opinion is, and long has been, that the mayor and aldermen of a city corporation, or the president and directors of a bank, or the president and directors of a railroad company, (and of other similar corporations,) are the true parties that sue and are sued as trustees and representatives of the constantly changing stockholders. These are not known to the public, and not suable in practice, by service of personal notice on them respectively, such as the laws of the United States require. If the president and directors are citizens of the State where the corporation was created, and the other party to the suit is a citizen of a different State, or a subject or citizen of a foreign government, then the courts of the United States can exercise jurisdiction under the third article of the Constitution. In this sense I understood Letson's case, and assented to it when the decision was made; and so it is understood now.

If all the real defendants are not within the jurisdiction of the court, because some of the directors reside beyond it, then the act of February 28, 1843, allows the suit to proceed, regardless of this fact, for the reasons stated in Litson's case. 2 How. 597.

If the United States courts could be ousted of jurisdiction, and citizens of other States and subjects of foreign countries be forced into the State courts, without the power of election, they would often be deprived, in great cases, of all benefit contemplated by the Constitution; and, in many cases, be compelled to submit their rights to judges and juries who are inhabitants of the cities where the suit must be tried, and to contend with powerful corporations, in local courts, where the chances of impartial justice would be greatly against them; and where no prudent man would engage with such an antagonist, if he could help it. State laws, by combining large masses of men under a corporate name, cannot repeal the Constitution; all corporations must have trustees and representatives, who are usually citizens of the State where the corporation is created; and these citizens can be sued, and the corporate property charged by the suit; nor can the courts allow the constitutional security to be evaded by unnecessary refinements, without inflicting a deep injury on the institutions of the country

Mr. Justice DANIEL.

In the opinion of the court, just announced in this cause, I am unable to concur.

Were the relative rights and interests of the parties to this

controversy believed to be regularly before this court, I should have coincided in the conclusions of the majority; for the reason, that all that is disclosed by the record, either of the traditions or the legislation of the States of Pennsylvania and New Jersey, shows an equal right or claim on the part of either of those States to the River Delaware, and to the uses to which the waters of that river might be applied. From such an equality in each of those States, it would seem regularly to follow, that no use or enjoyment of the waters of that river could be invested in the grantees of one of them, to the exclusion of the like use and enjoyment by the grantees of the other. The permission, therefore, from Pennsylvania to Adam Hoops, or his assignees, to apply the waters of the Delaware in the working of his mill, whatever estate or interest it might invest in such grantee, as against Pennsylvania, could never deprive the State of New Jersey of her equal privilege of applying the waters of the same river, either directly, in her corporate capacity, or through her grantee, the Delaware and Raritan Canal Company. My disagreement with my brethren in this case has its foundation in a reason wholly disconnected with the merits of the parties. It is deducible from my conviction of the absence of authority, either here or in the Circuit Court, to adjudicate this cause; and that it should therefore have been remanded, with directions for its dismissal, for want of jurisdiction.

The record discloses the fact, that the party defendant in the Circuit Court, and the appellee before this court, is a corporation, styled in the declaration, "a corporation created by the State of New Jersey." It is important that the style and character of this party litigant, as well as the source and manner of its existence, be borne in mind, as both are deemed material in considering the question of the jurisdiction of this court, and of the Circuit Court. It is important, too, to be remembered, that the question here raised stands wholly unaffected by any legislation, competent or incompetent, which may have been attempted in the organization of the courts of the United States; but depends exclusively upon the construction of the 2d section of the 3d article of the Constitution, which defines the judicial power of the United States; first, with respect to the subjects embraced within that power; and, secondly, with respect to those whose character may give them access, as parties, to the courts of the United States. In the second branch of this definition, we find the following enumeration, as descriptive of those whose position, as parties, will authorize their pleading or being impleaded in those courts; and this position is limited to "controversies to which the United States are a party; contro-

versies between two or more States, — between citizens of different States, — between citizens of the same State, claiming lands under grants of different States, — and between the citizens of a State and foreign citizens or subjects."

Now, it has not been, and will not be, pretended, that this corporation can, in any sense, be identified with the United States, or is endowed with the privileges of the latter; or if it could be, it would clearly be exempted from all liability to be sued in the Federal courts. Nor is it pretended, that this corporation is a State of this Union; nor, being created by, and situated within, the State of New Jersey, can it be held to be the citizen or subject of a foreign State. It must be, then, under that part of the enumeration in the article quoted, which gives to the courts of the United States jurisdiction in controversies between citizens of different States, that either the Circuit Court or this court can take cognizance of the corporation as a party; and this is, in truth, the sole foundation on which that cognizance has been assumed, or is attempted to be maintained. The proposition, then, on which the authority of the Circuit Court and of this tribunal is based, is this: The Delaware and Raritan Canal Company is either a citizen of the United States, or it is a citizen of the State of New Jersey. This proposition, startling as its terms may appear, either to the legal or political apprehension, is undeniably the basis of the jurisdiction asserted in this case, and in all others of a similar character, and must be established, or that jurisdiction wholly fails. Let this proposition be examined a little more closely.

The term *citizen* will be found rarely occurring in the writers upon English law; those writers almost universally adopting, as descriptive of those possessing rights or sustaining obligations, political or social, the term *subject*, as more suited to their peculiar local institutions. But, in the writers of other nations, and under systems of polity deemed less liberal than that of England, we find the term *citizen* familiarly reviving, and the character and the rights and duties that term implies, particularly defined. Thus, Vattel, in his 4th book, has a chapter, (cap. 6th,) the title of which is: "The concern a nation may have in the actions of her citizens." A few words from the text of that chapter will show the apprehension of this author in relation to this term. "Private persons," says he, "who are members of one nation, may offend and ill-treat the citizens of another; it remains for us to examine what share a state may have in the actions of her citizens, and what are the rights and obligations of sovereigns in that respect." And again: "Whoever uses a citizen ill, indirectly offends the state, which is bound to protect this citizen." The meaning of the term *citi-*

*zen* or *subject*, in the apprehension of English jurists, as indicating persons in their natural character, in contradistinction to artificial or fictitious persons created by law, is further elucidated by those jurists, in their treatises upon the origin and capacities and objects of those artificial persons designated by the name of *corporations.* Thus, Mr. Justice Blackstone, in the 18th chapter of his 1st volume, holds this language: " We have hitherto considered persons in their natural capacities, and have treated of their rights and duties. But, as all personal rights die with the person; and, as the necessary forms of investing a series of individuals, one after another, with the same identical rights, would be inconvenient, if not impracticable; it has been found necessary, when it is for the advantage of the public to have any particular rights kept on foot and continued, to constitute artificial persons, who maintain a perpetual succession, and enjoy a kind of legal immortality. These artificial persons are called *corporations.*"

This same distinguished writer, in the first book of his Commentaries, p. 123, says, " The rights of persons are such as concern and are annexed to the persons of men, and when the person to whom they are due is regarded, are called simply rights; but when we consider the person from whom they are due, they are then denominated, duties," And again, cap. 10th of the same book, treating of the PEOPLE, he says, " The people are either aliens, that is, born out of the dominions or allegiance of the crown; or natives, that is, such as are born within it." Under our own systems of polity, the term, citizen, implying the same or similar relations to the government and to society which appertain to the term, subject, in England, is familiar to all. Under either system, the term used is designed to apply to man in his individual character, and to his natural capacities; to a being, or agent, possessing social and political rights, and sustaining, social, political, and moral obligations. It is in this acceptation only, therefore, that the term, *citizen*, in the article of the Constitution, can be received and understood. When distributing the judicial power, that article extends it to controversies between citizens of different States. This must mean the natural physical beings composing those separate communities, and can, by no violence of interpretation, be made to signify artificial, incorporeal, theoretical, and invisible creations. A corporation, therefore, being not a natural person, but a mere creature of the mind, invisible and intangible, cannot be a citizen of a State, or of the United States, and cannot fall within the terms or the power of the above-mentioned article, and can therefore neither plead nor be impleaded in the courts of the United States. Against this position it may be urged, that the

converse thereof has been ruled by this court, and that this matter is no longer open for question. In answer to such an argument, I would reply, that this is a matter involving a construction of the Constitution, and that wherever the construction or the integrity of that sacred instrument is involved, I can hold myself trammelled by no precedent or number of precedents. That instrument is above all precedents; and its integrity every one is bound to vindicate against any number of precedents, if believed to trench upon its supremacy. Let us examine into what this court has propounded in reference to its jurisdiction in cases in which corporations have been parties; and endeavor to ascertain the influence that may be claimed for what they have heretofore ruled in support of such jurisdiction. The first instance in which this question was brought directly before this court, was that of the Bank of the United States v. Deveaux, 5 Cranch, 61. An examination of this case will present a striking instance of the error into which the strongest minds may be led, whenever they shall depart from the plain, common acceptation of terms, or from well ascertained truths, for the attainment of conclusions, which the subtlest ingenuity is incompetent to sustain. This criticism upon the decision in the case of the Bank v. Deveaux, may perhaps be shielded from the charge of presumptuousness, by a subsequent decision of this court, hereafter to be mentioned. In the former case, the Bank of the United States, a corporation created by Congress, was the party plaintiff, and upon the question of the capacity of such a party to sue in the courts of the United States, this court said, in reference to that question, "The jurisdiction of this court being limited, so far as respects the character of the parties in this particular case, to controversies between citizens of different States, both parties must be citizens, to come within the description. That invisible, intangible, and artificial being, that mere legal entity, a corporation aggregate, is certainly not a citizen, and consequently cannot sue or be sued in the courts of the United States, unless the rights of the members in this respect can be exercised in their corporate name. If the corporation be considered as a mere faculty, and not as a company of individuals, who, in transacting their business, may use a legal name, they must be excluded from the courts of the Union." The court having shown the necessity for citizenship in both parties, in order to give jurisdiction; having shown farther, from the nature of corporations, their absolute incompatibility with citizenship, attempts some qualification of these indisputable and clearly stated positions, which, if intelligible at all, must be taken as wholly subversive of the positions so laid down. After stating the requisite of citizenship, and showing that a corpo-

ration cannot be a citizen, " and consequently that it cannot sue or be sued in the courts of the United States," the court goes on to add, " unless the rights of the members can be exercised in their corporate name." Now, it is submitted that it is in this mode only, viz. in their corporate name, that the rights of the members can be exercised ; that it is this which constitutes the character, and being, and functions of a corporation. If it is meant beyond this, that each member, or the separate members, or a portion of them, can take to themselves the character and functions of the aggregate and merely legal being, then the corporation would be dissolved ; its unity and perpetuity, the essential features of its nature, and the great objects of its existence, would be at an end. It would present the anomaly of a being existing and not existing at the same time. This strange and obscure qualification, attempted by the court, of the clear, legal principles previously announced by them, forms the introduction to, and apology for, the proceeding, adopted by them, by which they undertook to adjudicate upon the rights of the corporation, through the supposed citizenship of the individuals interested in that corporation. They assert the power to look beyond the corporation, to presume or to ascertain the residence of the individuals composing it, and to model their decision upon that foundation. In other words, they affirm that in an action at law, the purely legal rights, asserted by one of the parties upon the record, may be maintained by showing or presuming that these rights are vested in some other person who is no party to the controversy before them.

Thus stood the decision of the Bank of the United States *v.* Deveaux, wholly irreconcilable with correct definition, and a puzzle to professional apprehension, until it was encountered by this court, in the decision of the Louisville and Cincinnati Railroad Company *v.* Letson, reported in 2 Howard, 497. In the latter decision, the court, unable to untie the judicial entanglement of the Bank and Deveaux, seem to have applied to it the sword of the conqueror; but, unfortunately, in the blow they have dealt at the ligature which perplexed them, they have severed a portion of the temple itself. They have not only contravened all the known definitions and adjudications with respect to the nature of corporations, but they have repudiated the doctrines of the civilians as to what is imported by the term *subject* or *citizen*, and repealed, at the same time, that restriction in the Constitution which limited the jurisdiction of the courts of the United States to controversies between " citizens of different States." They have asserted that, " a corporation created by, and transacting business in a State, is to be deemed an inhabitant of the State, capable of being treated

as a citizen, for all the purposes of suing and being sued, and that an averment of the facts of its creation, and the place of transacting its business, is sufficient to give the circuit courts jurisdiction."

The first thing which strikes attention, in the position thus affirmed, is the want of precision and perspicuity in its terms. The court affirm that a corporation created by, and transacting business within a State, is to be deemed an inhabitant of that State. But the article of the Constitution does not make inhabitancy a requisite of the condition of suing or being sued; that requisite is citizenship. Moreover, although citizenship implies the right of residence, the latter by no means implies citizenship. Again, it is said that these corporations may be treated as citizens, for the purpose of suing or being sued. Even if the distinction here attempted were comprehensible, it would be a sufficient reply to it, that the Constitution does not provide that those who may be treated as citizens, may sue or be sued, but that the jurisdiction shall be limited to citizens only; citizens in right and in fact. The distinction attempted seems to be without meaning, for the Constitution or the laws nowhere define such a being as a *quasi* citizen, to be called into existence for particular purposes; a being without any of the attributes of citizenship, but the one for which he may be temporarily and arbitrarily created, and to be dismissed from existence the moment the particular purposes of his creation shall have been answered. In a political, or legal sense, none can be treated or dealt with by the government as citizens, but those who are citizens in reality. It would follow, then, by necessary induction, from the argument of the court, that as a corporation must be treated as a citizen, it must be so treated to all intents and purposes, because it is a citizen. Each citizen (if not under old governments) certainly does, under our system of polity, possess the same rights and faculties, and sustain the same obligations, political, social, and moral, which appertain to each of his fellow-citizens. As a citizen, then, of a State, or of the United States, a corporation would be eligible to the State or Federal legislatures; and if created by either the State or Federal governments, might, as a native-born citizen, aspire to the office of President of the United States—or to the command of armies, or fleets, in which last example, so far as the character of the commander would form a part of it, we should have the poetical romance of the spectre ship realized in our Republic. And should this incorporeal and invisible commander not acquit himself in color or in conduct, we might see him, provided his arrest were practicable, sent to answer his delinquencies before a court-martial, and subjected to the penal-

9*

ties of the articles of war. Sir Edward Coke has declared, that a corporation cannot commit treason, felony, or other crime; neither is it capable of suffering a traitor's or felon's punishment; for it is not liable to corporeal penalties — that it can perform no personal duties, for it cannot take an oath for the due execution of an office; neither can it be arrested or committed to prison, for its existence being ideal, no man can arrest it; neither can it be excommunicated, for it has no soul. But these doctrines of Lord Coke were founded upon an apprehension of the law now treated as antiquated and obsolete. His lordship did not anticipate an improvement by which a corporation could be transformed into a citizen, and by that transformation be given a physical existence, and endowed with soul and body too. The incongruities here attempted to be shown as necessarily deducible from the decisions of the cases of the Bank of the United States *v.* Deveaux, and of the Cincinnati and Louisville Railroad Company *v.* Letson, afford some illustration of the effects which must ever follow a departure from the settled principles of the law. These principles are always traceable to a wise and deeply founded experience; they are, therefore, ever consentaneous, and in harmony with themselves and with reason; and whenever abandoned as guides to the judicial course, the aberration must lead to bewildering uncertainty and confusion. Conducted by these principles, consecrated both by time and the obedience of sages, I am brought to the following conclusions: 1st. That by no sound or reasonable interpretation, can a corporation — a mere faculty in law, be transformed into a citizen, or treated as a citizen. 2d. That the second section of the third article of the Constitution, investing the courts of the United States with jurisdiction in controversies between citizens of different States, cannot be made to embrace controversies to which corporations and not citizens are parties; and that the assumption, by those courts, of jurisdiction in such cases, must involve a palpable infraction of the article and section just referred to. 3d. That in the cause before us, the party defendant in the Circuit Court having been a corporation aggregate, created by the State of New Jersey, the Circuit Court could not properly take cognizance thereof; and, therefore, this cause should be remanded to the Circuit Court, with directions that it be dismissed for the want of jurisdiction.

## *Order:*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the

District of New Jersey, and was argued by counsel. On con-sideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed with costs.