TWO GUYS FROM HARRISON-ALLENTOWN, INC.,
*v.* McGINLEY, DISTRICT ATTORNEY, LEHIGH
COUNTY, PENNSYLVANIA, ET AL.

No. 36.   Argued December 8, 1960.—Decided May 29, 1961.

*Harold E. Kohn* argued the cause for appellant. With him on the brief were *William T. Coleman, Jr., Louis E. Levinthal, Harry A. Kalish* and *Oscar Brown.*

*Harry J. Rubin* argued the cause for appellees. With him on the brief was *Anne X. Alpern,* Attorney General of Pennsylvania.

*Lawrence Speiser, Rowland Watts* and *Jacob S. Richman* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The primary questions presented in this case are whether a Pennsylvania statute enacted in 1959 [1] which

---

[1] 18 Purdon's Pa. Stat. Ann. (1960 Cum. Supp.) § 4699.10 provides:
"Selling certain personal property on Sunday
"Whoever engages on Sunday in the business of selling, or sells or offers for sale, on such day, at retail, clothing and wearing apparel,

makes unlawful the Sunday retail sale of certain commodities, imposing a fine of up to one hundred dollars for the first offense, is violative of the constitutional guarantees of equal protection of the laws and religious freedom.

This case is essentially the same as *McGowan* v. *Maryland, ante,* p. 420, decided today. The major differences between the Pennsylvania and Maryland Sunday Closing Laws concern the specific provisions for exemptions from the general proscription of Sunday sales and activities. The religiously oriented backgrounds of both the Maryland and Pennsylvania statutes are strikingly similar although the Pennsylvania colony never had an established church while one did exist for a time in Maryland. While the pronouncements of the Supreme Court of Pennsylvania indicate that it disclaimed a religious purpose for Sunday closing at an earlier date than did the Maryland Court of Appeals, later Pennsylvania decisions returned to religious purpose language while the Maryland opinions consistently rested on secular bases. On the other hand, the legislative history of the most recent Pennsylvania Sunday provisions is more striking than that

---

clothing accessories, furniture, housewares, home, business or office furnishings, household, business or office appliances, hardware, tools, paints, building and lumber supply materials, jewelry, silverware, watches, clocks, luggage, musical instruments and recordings, or toys, excluding novelties and souvenirs, shall, upon conviction thereof in a summary proceeding for the first offense, be sentenced to pay a fine of not exceeding one hundred dollars ($100), and for the second or any subsequent offense committed within one year after conviction for the first offense, be sentenced to pay a fine of not exceeding two hundred dollars ($200) or undergo imprisonment not exceeding thirty days in default thereof.

"Each separate sale or offer to sell shall constitute a separate offense.

"Information charging violations of this section shall be brought within seventy-two hours after the commission of the alleged offense and not thereafter."

of the Maryland laws in providing support for the position that temporal considerations preoccupied the State Legislature.

Appellant is a corporation which operates a large discount department store located on a highway in Lehigh County, Pennsylvania. For some time prior to the instant litigation, McGinley, the County District Attorney, prosecuted a number of appellant's employees for violating 18 Purdon's Pa. Stat. Ann. § 4699.4, a section of the Pennsylvania Penal Code of 1939.[2] This statute, with certain exceptions, generally forbids all worldly employment, business and sports on Sunday. Works of charity and necessity are excepted, as is the delivery of milk and necessaries before 9 a. m. and after 5 p. m. Two recent amendments also except wholesome recreation (defined as golf, tennis, boating, swimming, bowling, basketball, picnicking, shooting at inanimate targets and similar healthful or recreational exercises and activities) and work in connection with the rendering of service by a public utility. Violations of this section carry a penalty

---

[2] § 4699.4. "Worldly employment or business on Sunday

"Whoever does or performs any worldly employment or business whatsoever on the Lord's day, commonly called Sunday (works of necessity and charity only excepted), or uses or practices any game, hunting, shooting, sport or diversion whatsoever on the same day not authorized by law, shall, upon conviction thereof in a summary proceeding, be sentenced to pay a fine of four dollars ($4), for the use of the Commonwealth, or, in default of the payment thereof, shall suffer six (6) days' imprisonment.

"Nothing herein contained shall be construed to prohibit the dressing of victuals in private families, bake-houses, lodging-houses, inns and other houses of entertainment for the use of sojourners, travellers or strangers, or to hinder watermen from landing their passengers, or ferrymen from carrying over the water travellers, or persons removing with their families on the Lord's day, commonly called Sunday, nor to the delivery of milk or the necessaries of life, before nine of the clock in the forenoon, nor after five of the clock in the afternoon of the same day."

of four dollars. Appellant then sought an injunction in the court below to restrain the District Attorney from enforcing this statute against it, alleging that the statute was unconstitutional for the reasons stated above and because the District Attorney was discriminating against appellant in enforcing the law. Accordingly, a three-judge court was convened pursuant to 28 U. S. C. §§ 2281 and 2284. Before trial, the Pennsylvania Legislature enacted the 1959 provision and appellant amended its complaint to include it, alleging that the District Attorney was threatening to enforce it against appellant.

Although appellant challenged only the statutory sections mentioned above, in order to properly consider appellant's contentions, the whole body of Pennsylvania Sunday Laws must be examined.[3] Among the other activities prohibited on Sunday by these Pennsylvania statutes are selling of motor vehicles and trailers, operation of pool rooms or billiard rooms, conduct of boxing or wrestling matches, harness racing, pawnbrokering, contests for retrieving dogs, catching of fish in the Delaware River by use of a net, and extension education in public school buildings. The Sunday exhibition of motion pictures is permitted only after 2 p. m., and then only if the voters in each municipality approve; however, religious motion pictures may be shown by churches at any time providing they are shown within church property and no admission price is charged. Baseball, football and

---

[3] These laws, in their entirety, may be found in 4 Purdon's Pa. Stat. Ann. §§ 1, 30.202, 59–66, 81–91, 121–127, 151–157, 181–185, 307 (c); 18 Purdon's Pa. Stat. Ann. §§ 632, 633, 4651, 4699.4, 4699.9, 4699.10; 24 Purdon's Pa. Stat. Ann. § 19–1903; 30 Purdon's Pa. Stat. Ann. §§ 118, 138, 153, 265, 273; 34 Purdon's Pa. Stat. Ann. §§ 1311.702, 1311.719, 1311.721, 1311.731, 1311.1205; 43 Purdon's Pa. Stat. Ann. § 361; 47 Purdon's Pa. Stat. Ann. §§ 3–304, 4–406, 4–492; 51 Purdon's Pa. Stat. Ann. § 623; 53 Purdon's Pa. Stat. Ann. §§ 23130, 37403 (24); 61 Purdon's Pa. Stat. Ann. §§ 184, 195; 63 Purdon's Pa. Stat. Ann. §§ 281–28, 519, 559.

polo receive similar treatment except the permitted hours are between 1 p. m. and 7 p. m. Public concerts, of music of high order though not necessarily sacred, may only be performed after noon.

The off-the-premises sale of alcoholic beverages on Sunday is disallowed; but private clubs may sell alcoholic beverages to their members on Sunday, as may hotel restaurants between 1 p. m. and 10 p. m. in first- and second-class Pennsylvania cities if the voters in those cities so choose. Municipalities and third-class Pennsylvania cities have statutory authority to restrain desecrations of the Sabbath day; one statutory section simply empowers various judicial officers to punish persons who profane the Lord's day. Barbering and beauty culture work on Sunday subjects the actor to license revocation. Male prisoners may not perform manual labor on Sunday, and bakery employees are not permitted to commence working on Sunday before 6 p. m.

The statutes generally proscribe hunting and shooting on Sunday but make an exception for the removal of fur-bearing animals from traps. Sunday fishing from public lands or in public waters is permitted, but not on private property without the consent of the owner. Also banned is the training of dogs except with the permission of the owner upon whose land the activity is undertaken.

The court below, although finding that McGinley threatened to enforce the 1959 Act against appellant's employees, denied appellant the injunctive relief sought, dismissing appellant's constitutional objections that the 1959 statute was a law respecting an establishment of religion, that the statute preferred one religion over others and that the classifications drawn by the statute were violative of equal protection of the law. The three-judge court declined to pass on the constitutionality of the 1939 statute because it found that, since the 1959 statute was now in effect, there was no imminent threat

to appellant of being prosecuted under the 1939 enactment. The court also felt it its duty to refrain from passing upon the 1939 statute because it believed that there was a substantial unsettled question of Pennsylvania law as to whether the 1939 Act was superseded by the 1959 Act so far as the specific commodities covered by the latter statute. Regarding appellant's contention that McGinley was enforcing the 1939 statute discriminatorily, the court held that since McGinley had recently made substantial efforts to compel observance of the statute by numerous retail stores, since the relief appellant sought was wholly prospective and since McGinley's term of office as District Attorney was expiring within a month of the decision, there was no basis for finding that there would be future discriminatory enforcement of the 1959 statute, 179 F. Supp. 944. On appeal brought under 28 U. S. C. § 1253, we noted probable jurisdiction. 362 U. S. 960.

## I.

Before reaching the primary questions presented, several ancillary matters must be considered. First, appellant contends that McGinley discriminated against it in enforcing the laws. Recognizing that a mootness problem exists because Lehigh County now has a new District Attorney,[4] appellant contends that there are still pending prosecutions against its employees initiated as the result of the alleged discriminatory action. Since appellant's employees may defend against any such proceeding that is actually prosecuted on the ground of unconstitutional discrimination, we do not believe that the court below

---

[4] The new District Attorney was "substituted as an additional defendant" in the court below on appellant's motion, which stated that appellant "has no reason to believe and, therefore, does not aver that [the new District Attorney] will discriminatorily enforce [the] laws as did his predecessor . . . ."

was incorrect in refusing to exercise its injunctive powers at that time.

Furthermore, we do not believe that the three-judge District Court abused its discretion in declining to pass on the constitutionality of the 1939 statute for the reasons stated. *Railroad Commission* v. *Pullman Co.*, 312 U. S. 496. The court below made clear that if appellant's employees were threatened with prosecution under the 1939 Act, and if the Pennsylvania courts decided that the 1939 Act still applies to appellant, that would be time enough to consider that statute's validity. Similarly, we do not believe that the court abused its equity power in refusing to continue the preliminary injunction barring enforcement of the 1939 statute against appellant, since there was no imminent threat of prosecution.

## II.

Appellant urges that the 1959 enactment is contrary to the Fourteenth Amendment's mandate of equal protection of the laws because, without rational basis, the statute singles out only twenty specified commodities, the Sunday sale of which is penalized by a fine of up to one hundred dollars for the first offense and, for subsequent offenses committed within one year, a fine of up to two hundred dollars or, in default thereof, imprisonment not to exceed thirty days; and also because the statute's proscription extends only to retail sales. Appellant argues that to forbid the Sunday sale of only some items while permitting the sale of many others and to exclude only retailers from Sunday operation while exempting wholesalers, service dealers, factories, and those engaged in the other excepted activities defeats the State's alleged interest of providing a day of rest and tranquillity for all.[5]

---

[5] Concomitantly, appellant states the statute violates due process for these same reasons.

The standards for evaluating these contentions have been set out in *McGowan* v. *Maryland, ante,* pp. 425–426; we need not restate them here. First, appellant's argument overlooks the fact that the 1939 Pennsylvania statute prohibits *all* worldly employment or business, with narrowly drawn exceptions; the 1959 enactment now before us simply supplements the prior regulation. The existing system then imposes a greater penalty for the Sunday sale of some items at retail than it imposes for other Sunday retail sales and for the other Sunday activities that appellant seems to have assumed are not forbidden at all. Of course, as to works of charity, necessity or recreation, the State Legislature could find that the interests of its citizens are best served by permitting these Sunday activities; that their interference with the absolute tranquillity of the day is justified by their requirement and desirability. *McGowan* v. *Maryland, supra,* at p. 426.

As to the rationality of imposing a heavier penalty for the Sunday sale of the selected commodities, the court below found:

> "that the 1939 closing law was observed by most retail sellers in Lehigh County, though not all, who were subject to its provisions, until the very recent opening of substantial suburban retail businesses like that of the plaintiff initiated and triggered new and rather large scale violations, and threats of others . . . [and] that the small four dollar penalty of the earlier law was inadequate to deter the Sunday opening of large retail establishments which could easily absorb such small fines as an incidental cost of doing a profitable business. Moreover, it appeared that the types of commodities covered by this new enactment are principal categories of merchandise sold in these establishments which have made the problem of

Sunday retail selling newly acute." 179 F. Supp.,
at 952.[6]

It was within the power of the legislature to have
concluded that these businesses were particularly dis-
rupting the intended atmosphere of the day because of
the great volume of motor traffic attracted,[7] the danger
of their competitors also opening on Sunday[8] and their
large number of employees. "Evils in the same field may
be of different dimensions and proportions, requiring dif-

---

[6] Commenting on prior English Sunday legislation, a Member of
Parliament stated:

"The penalty is a fine of 5s., and nobody will suggest that that is
effective in any way. It simply means the payment of 5s., with a
little expense added to that, in order to keep open on Sundays, and it
seems to me that the Statute of 1677, applied to modern condi-
tions, is nothing short of ridiculous." 308 Parliamentary Debates,
Commons, 2167.

[7] A Pennsylvania legislator stated:

"It was several months ago, over a year ago, that a business from
New Jersey moved into the aforementioned Whitehall Township of
Lehigh County. It was known as the 'Two Guys from Harrison.'
They started operating on Sunday. It was a novelty. The people
came from Northampton, Bucks, Monroe, Pike, Schuylkill and all the
surrounding counties, so much so that they jammed traffic on the
highways of the Seventh Street Pike in Allentown and Whitehall
Township. However, the people came and they did business. There
were other enterprises along the same route which were open on
Sunday and doing business." 36 Pennsylvania Legislative Journal
1143.

[8] This problem was recognized when the English legislation was
being considered. A Member of Parliament stated:

"So far, happily, the great combine and chain stores have not
entered on Sunday trading, but they are business enterprises and it is
not impossible that they may find themselves compelled by economic
considerations and pressure of local circumstances to open on Sun-
day, because Parliament takes no action to control and regulate
Sunday business in retail shops. If that development should take
place, we shall find our shopping centres on a Sunday no different in
any way from the bustle, noise and glamour of the week-day trade."
308 Parliamentary Debates, Commons, 2166.

ferent remedies. . . . Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. . . . The legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson* v. *Lee Optical,* 348 U. S. 483, 489.[9]

## III.

Appellant contends that the Pennsylvania Sunday Closing Law is one respecting an establishment of religion because it commemorates the Resurrection, obliges everyone to honor this basic doctrine of the major Christian denominations by abstaining from work and encourages Christian religious worship. Appellant also alleges that the statute discriminates against certain religions. For the same reasons stated in *McGowan* v. *Maryland, supra,* at pp. 429–431, we hold that appellant has standing to raise only the first contention.[10]

To prove its argument, appellant relies on the language of the present laws in question, on the prior history of this legislation and on various statements of the Pennsylvania courts in interpreting the statutes. We agree that an inquiry into these matters is relevant. *McGowan* v. *Maryland, supra,* at p. 431.

The court below found that the connection between religion and the original Pennsylvania Sunday closing statutes was obvious and indisputable. This is clearly demonstrated by the first Pennsylvania Sunday law, enacted in 1682.[11] There were re-enactments several years

---

[9] The basic English Sunday statute, 29 Charles II, c. 7 (1677), imposed differing fines for different proscribed activities.

[10] MR. JUSTICE BLACK is of the opinion that appellant also has standing to raise the second contention and that the claim is without merit. See *McGowan* v. *Maryland, ante,* at p. 429, n. 6.

[11] "Whereas, the glory of Almighty God and the good of Mankind, is the reason & end of government, and therefore, government in

later, and again in 1700, which once more stated the purposes of preventing "Looseness, Irreligion, and Atheism," and of better permitting on Sunday the reading of the scriptures at home or the frequenting of meetings of religious worship. *Id.*, at 192. 2 Statutes at Large of Pennsylvania 3–4. In 1705, some changes appeared.

---

itself is a venerable Ordinance of God. And forasmuch as it is principally desired and intended by the Proprietary and Governor and the freemen of the Province of Pennsylvania and territories thereunto belonging, to make and establish such Laws as shall best preserve true Christian and Civil Liberty, in opposition to all Unchristian, Licentious, and unjust practices, (Whereby God may have his due, Caesar his due, and the people their due,) from tyranny and oppression on the one side, and insolence, and Licentiousness on the other, so that the best and firmest foundation may be layd for the present and future happiness of both the Governor and people, of the Province and territories aforesaid, and their posterity.

"*Be it therefore Enacted by William Penn, Proprietary and Governour, by, and with the Advice and Consent of the Deputies of the freemen of this Province and Counties aforesaid, in Assembly met, and by the Authority of the same,* That these following Chapters and Paragraphs shall be the Laws of Pennsylvania and the territories thereof.

"Chap. I. Almighty God, being Only Lord of Conscience father of Lights and Spirits, and the author as well as object of all Divine knowledge, faith, and Worship, who only can enlighten the mind, and persuade and convince the understandings of people. In due reverence to his Sovereignty over the Souls of Mankind . . . .

.     .     .     .     .

"But to the end That Looseness, irreligion, and Atheism may not Creep in under pretense of Conscience in this Province, *Be It further Enacted by the Authority aforesaid,* That, according to the example of the primitive Christians, and for the ease of the Creation, Every first day of the week, called the Lord's day, People shall abstain from their usual and common toil and labour, That whether Masters, Parents, Children, or Servants, they may the better dispose themselves to read the Scriptures of truth at home, or frequent such meetings of religious worship abroad, as may best sute their respective persuasions." Charter and Laws of the Province of Pennsylvania 1682–1700, 107–108.

The preamble of the statute remained religious [12] and the stated purposes of Bible reading and religious worship continued. However, some of the exceptions still present in the 1939 statute first appeared, but a specific ban on the drinking of alcoholic beverages in public houses was enacted. *Id.*, at 175–177. The most apparent forerunner of the 1939 statute was passed in 1779. The preamble stated only that the purpose was "for the due observation of the Lord's day." 9 Statutes at Large of Pennsylvania 333. No mention was made of Bible reading or religious worship and the specific Sunday prohibition concerning alcoholic beverages was omitted. By 1786, the preamble completely disappeared, 12 Statutes at Large of Pennsylvania 314. See 15 Statutes at Large of Pennsylvania 110 for the final colonial enactment in 1794.

The present statutory sections still contain some traces of the early religious influence. The 1939 statute refers to Sunday as "the Lord's day"; but it is included in the general section entitled, "Offenses Against Public Policy, Economy and Health." Title 18 Purdon's Pa. Stat. Ann. § 4651 uses the term "Sabbath Day" and refers to the other days of the week as "secular days." But almost every other statutory section simply uses the word "Sunday" and contains no language with religious connotation. It would seem that those traces that have remained are simply the result of legislative oversight in failing to remove them. Section 4651 was re-enacted in 1959 and happened to retain the religious language; many other statutory sections, passed both before and after this date, omit it. Certain political subdivisions are authorized to restrain "desecrations of the Sabbath day," and there is a

---

[12] It stated:

"To the end that all people within this province may with the greater freedom devote themselves to religious and pious exercises." *Id.*, at p. 175.

jurisdictional section authorizing the punishment of persons who "profane the Lord's day." But many of the activities historically considered to be profane—*e. g.*, the consumption of alcoholic beverages—are now no longer totally prohibited. There is a general immunity for religious motion pictures and some of the recently exempted activities are permitted only during Sunday afternoons.

On the other hand, we find that the 1939 statute was recently amended to permit all healthful and recreational exercises and activities on Sunday. This is not consistent with aiding church attendance; in fact, it might be deemed inconsistent. And the statutory section, § 4699.10, the constitutionality of which is immediately before us, was promoted principally by the representatives of labor and business interests.[13] Those Pennsylvania legislators who favored the bill specifically disavowed any religious purpose for its enactment but stated instead that economics required its passage.[14]

---

[13] 36 Pennsylvania Legislative Journal 1139, 2553, 2682–2683.

[14] For example:

"As I read this bill, I find nothing in it which is of a religious nature. The bill is prompted by the thousands of letters that we have all received in the Senate of Pennsylvania, asking us to do something for the men and women who work in the department stores. These people are not asking to go to church; they are asking for a day of rest.

"I do not find anyone complaining about the Act passed at the last Session concerning the automobile business.

"This is a bill which has been crystalized by, I think, a very great organized labor section in our Commonwealth, the American Federation of Labor. They are in favor of it. They are heading up a group of people who have no particular voice to speak for them. I believe it is the obligation of the Senate of Pennsylvania to vote for this bill in order to give some recognition to the men and women who work and who are compelled to work on Sundays, whether they like it or whether they do not like it.

"This is not a bill. It is rather an indictment of our civilization which makes this kind of legislation possible and necessary. It is

As early as 1848, the Pennsylvania Supreme Court vociferously disclaimed that the purpose of Sunday closing was religious:

"All agree that to the well-being of society, periods of rest are absolutely necessary. To be productive of the required advantage, these periods must recur at stated intervals, so that the mass of which the community is composed, may enjoy a respite from labour at the same time. They may be established by common consent, or, as is conceded, the legislative power of the state may, without impropriety, interfere to fix the time of their stated return and enforce obedience to the direction. When this happens, some one day must be selected, and it has been said the round of the week presents none which, being preferred, might not be regarded as favouring some one of the numerous religious sects into which mankind are divided. In a Christian community, where a very large majority of the people celebrate the first day of the week as their chosen period of rest from labour, it is not surprising that that day should have received the legislative sanction: and as it is also devoted to religious observances, we are prepared to estimate the reason why the statute should speak of it as the Lord's day, and denominate the infraction of its legalized rest, a profanation. *Yet this does not change the character of the enactment. It is still, essentially, but a civil regulation made for the government of man as a member of society,* and obedience to it may properly be enforced by penal sanctions." *Specht*

---

too bad that business will not permit its employees to have a day of rest. It is too bad that we must legislate morals, as we may be doing in this bill." *Id.,* at 1139. See also *id.,* at 1137–1140, 2564–2565, 2682–2685.

v. *Commonwealth,* 8 Pa. 312, 323. (Emphasis added.) [15]

Concededly, there were a number of cases [16] decided after *Specht* which used language strongly supporting appel-

---

[15] The Pennsylvania court also stated:

"The error of the plaintiff's position is that it confounds the reason of the prohibition with its actual effect, and thus mistakes the mere restraint of physical exertion for the fetters that clog the freedom of mind and conscience. But were this otherwise, the plaintiff's argument is inapplicable to the act of 1794. The conclusions drawn from some of its language are as inexpressive of its practical operation, as of the principal intent of its makers. The phraseology used may indicate a conviction of the holy character of the first day of the week, but as this simple expression of an abstract opinion, which all other men are at liberty to adopt or reject, carries with it no obligation beyond the influence attendant upon the expression itself, it cannot be said a primary object of the act was, authoritatively, to assert the supremacy of Sunday as of Divine appointment. Had such been the intent, irrespective of its statutory character as a day of rest from secular employment, its framers would not have stopped short with a bare interdiction of labour and worldly amusements. Following the example offered by older states and communities, they would have commanded the performance of religious rites, or at least, some express recognition of the day as the true Sabbath. Such a requisition, we agree with the plaintiff in error, would be a palpable interference with the rights of conscience. But nothing like this is exacted. On the contrary, every one is left at full liberty to shape his own convictions, and practically to assert them to the extent of a free exercise of his religious views. In this, as in other respects, the conscience of each is left uncontrolled by legal coercion, to pursue its own inquiries and to adopt its own conclusions. In this aspect of the statute there is, therefore, nothing in derogation of the constitutional inhibition." *Id.,* at 324.

[16] See *Johnston* v. *Commonwealth,* 22 Pa. 102, 111 (1853); *Commonwealth* v. *Nesbit,* 34 Pa. 398, 405–409 (1859); *Society for the Visitation of the Sick* v. *Commonwealth ex rel. Meyer,* 52 Pa. 125, 135 (1866); *Sparhawk* v. *Union Passenger R. Co.,* 54 Pa. 401, 408–409, 423 (1867); *Commonwealth* v. *American Baseball Club,* 290 Pa. 136, 141, 143, 138 A. 497, 499 (1927).

lant's position. But these cases, the last of which was decided more than thirty years ago, did not squarely decide a constitutional contention. More persuasively, in the only recent appellate case dealing with the constitutionality of the 1939 statute, the Pennsylvania Superior Court affirmed an opinion which specifically relied on the language and reasoning of *Specht. Commonwealth* v. *Bauder,* 188 Pa. Super. 424, 145 A. 2d 915, affirming 14 Pa. D. & C. 2d 571.

Having carefully examined the entirety of the present legislation, the relevant judicial characterizations and, particularly, the legislative history leading to the passage of the 1959 Act immediately before us, we hold that neither the statute's purpose nor its effect is religious. See *McGowan* v. *Maryland, supra,* at p. 449. Moreover, for the same reasons stated in *McGowan* v. *Maryland, supra,* at pp. 449–452, we reject appellant's contention that the State has other means at its disposal to accomplish its secular purpose that would not even remotely or incidentally give state aid to religion.

Accordingly, the decision is

*Affirmed.*

[For opinion of MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE HARLAN, see *ante,* p. 459.]

[For dissenting opinion of MR. JUSTICE DOUGLAS, see *ante,* p. 561.]