Morris Weinfeld, J.
The defendant is connected with a corporation which is in the wholesale fruit and produce industry. That company is licensed and regulated by the United States Department of Commerce (see U. S. Code, tit. 7, § 499a et seq.- — • Perishable Agricultural Commodities Act). It acts as a commission merchant, dealer, broker and the like in the business of buying and handling perishable agricultural commodities and selling them to wholesalers, hospitals, institutions and municipalities in New York and other States. Approximately 1,200 carloads and trailer loads are so dealt with each year by defendant’s company, about 150 thereof having both its source and its end in New York State.
For some appreciable time defendant’s company was part of that general complex of the fruit and produce industry known as the “ Washington Market”. The latter was for countless years a fixture in the life of lower Manhattan Island. It was the largest market of its kind in the world and was the heart of the industry for the receipt, repackaging and transshipment of perishable foodstuffs for the eastern section of this country. As such, because of the very perishable nature of the commodities involved and the need for the distributors and retailers to move their wares to the purchasing and consuming public early each morning, the Washington Market merchandise had to be handled at night. It became, and still is, known as a night industry. Work there generally began late each afternoon and continued through the night into the wee hours of the morning when full distribution was completed. Thus healthful aliment was made available for millions of people each day. Many industries, too, which used fresh foodstuffs — restaurants, hotels, airlines, factory cafeterias, for example — were dependent upon the efficient working of this night-time industry.
But true to biblical tradition and tenet, those who work in the Washington Market area necessarily had to take one day off a week to relax and to allow physical regenerative processes to take over; and some, in addition, to observe their religious rites. This in no way interfered with other segments of the fresh foodstuffs market since stores for retail distribution were generally shut for one day, also. By common agreement that day was Sunday. Therefore the Washington Market was closed on Saturdays. But for Monday morning- distributions, market activities resumed once again each Sunday afternoon, with the same consequent functions and routines as on all other days except Saturdays.
On March 6, 1967 nothing changed except locale. That day ended Washington Market on lower Manhattan. It became, as *487 so many landmarks these days, a victim of urban renewal. The market moved to the New York City Terminal Market in The Bronx at Hunts Point. Because of lack of space, not all of the merchants there could be accommodated. Some, therefore, like defendant’s firm, took up quarters and operated in adjacent areas. It was, nevertheless, still part of the now transplanted complex. But with the move to The Bronx from Manhattan, a new element was injected. According to defendant’s counsel, it was not theretofore encountered while the market was in Manhattan.
Por almost a century the Washington Market area became a beehive of activity on late Sunday afternoons after Saturday’s lethargy, and never had any of the merchants been charged with having violated the Sabbath laws (Penal Law, art. 192). Yet, as soon as the reluctant move was made by the market to the Hunts Point area, the two police precincts which covered that police jurisdictional area immediately began the issuance of summonses for the alleged violation of such laws. Nine of these cases are before the court now under the stipulated agreement that the decision rendered in one shall apply to the other eight in like manner and effect.
Besides the agreement that the police officers in each case observed the defendant’s firm working at the place, times and Sundays specified in the respective complaints on perishable commodities, among which were potatoes, oranges, sprouts, apples, lemons and onions, 10 photographs, agreed upon fairly to represent the nature and character of the warehouse and the neighborhood, were introduced into evidence. Unquestionably it is generally a commercial and not a residential neighborhood.
The People’s contention is basic and uncomplicated. There is no argument, it is claimed, that the removing of 1 ‘ produce from freight cars, bringing them into a warehouse, and rebagging them” on a Sunday is a violation of section 2143 of the Penal Law by which ‘1 all labor on Sunday is prohibited, excepting the works of necessity and charity. In works of necessity or charity is included whatever is needful during the day for the good order, health and comfort of the community”.
To support the People’s view an 85-year-old case is cited (Dinsmore v. Netu York Bd. of Police, 12 Abb. N. C. 436, 445 [1882]). That case draws a distinction between interstate and intrastate transactions involving perishable commodities, allowing tiie latter the legal benefit of police power regulations. Defendant, however, contends that since there has been Federal pre-emption for interstate shipments of this kind, no separation by local legislative fiat can be made so as to validate part of the *488 same operation and make illegal the other part. This would include the Sabbath laws. The People counter with the claim that if the defendant’s goods enjoyed any interstate immunity at all, such immunity was frustrated by what they call ‘ ‘ a local food processing operation” in the repackaging of original shipments into smaller bags.
The court prefers to put its decision on more modern and broader concepts than the theorizing of whether this Sabbath law is an interference with interstate commerce. The problem transcends that arguable legal principle. The Sabbath laws have a far greater impact on the progress necessary to people’s lives today. For in 1882 the molders of legal thought could hardly have envisioned what today has become basic everyday requirements of life — like breathing and eating.
The statute is explicit. It is unambiguous. The words are clear. Disjunctive are the alternative excepted works: “of necessity or charity”. This ease is not affected by the latter. The issue involves the former. Does the defendant’s operation ■ become a work ‘ ‘ of necessity ’ ’ within the purview of the statute so as to exempt defendant from the sanctions of Sabbath violations 1 It is here that the basic dichotomy arises. The People say that defendant is ‘ ‘ not employed in a work of necessity. Necessity per se connotes indispensability ”. Defendant claims that ‘ ‘ Fresh fruits and vegetables are a necessary part of the public’s diet requirements * * * and * * * if the * * * industry was prohibited from working on Sundays, there would be no deliveries for a two-day period [and] the ultimate sufferers would be the public ”.
Sabbath laws are old laws. They had their origin in religion (Two Guys v. McGinley, 366 U. S. 582, 584). They have survived only because the courts have twisted them into artificial atmospheres which rarely escape their truly secular labels given by dissenting Judges (see Justices Douglas, Brennan and Stewart dissents in McGowan v. Maryland, 366 U. S. 420, Gallagher v. Crown Kosher Market, 366 U. S. 617; Two Guys, supra; Braunfeld v. Brown, 366 U. S. 599; for a complete discussion see dissenting opinion in People v. Finkelstein (38 Misc 2d 791, 794, affd. 41 Misc 2d 35, affd. 14 N Y 2d 608, cert. den. 377 U. S. 1006, Justice Douglas dissenting and voted to grant certiorari) . They are still here by sufferance. But the world moves ever forward. With its older vintage come new ideas and new approaches to old ideas. Time is constant in its inexorable progress. Unless life is constant in its ever-changing phases in attuning itself to this progress in time, then the clock has left reality of life behind. Laws must forever be ambient, *489 encompassing on all sides the march forward. Applying laws unrealistically makes a shambles of justice; and this, regardless of the original intent of the laws when enacted.
What is meant by “ works of necessity ” or matters “ needful during the day for the good order, health and comfort of the community ”? One who washes his own clothes on Sunday does not violate this section 2143 because “ Slovenliness is no part of any religion * * * Scripture recommends cleanliness ’ ’ (People v. Aliprantis, 8 A D 2d 276,278. See, also, the allied matter of a public laundromat being legally open on Sunday, People v. Andob Corp., 25 Misc 2d 542). Nor is painting one’s mother-in-law’s house on Sunday anything but a “work of necessity ” (People v. Deen, 3 A D 2d 836). The court has not heard of any case wherein the owner of a subway or airport or public highway vending machine selling cigarettes, chewing gum, insurance, paper back books, ice, handkerchiefs, tags, postage stamps, pencils, pens and the like on Sunday was prosecuted under this section. However, these commercial phenomena have become parts of people’s daily and Sunday lives in that they are familiar and regularly used and have become a necessary part of them. But they are not really8 ‘ works of necessity ’ ’ in the wording of the statute, for they are not truly indispensable. People can live without them or without gas, electricity or automobiles. But speedy life today demands these uses. They are therefore necessary in today’s human high standard of living. Life would stagnate without them. Does the gas or electricity repairman or automobile mechanic suffer prosecution for working on Sunday? Soon there will be the same kind of service on Sunday by air-pollution technicians to permit proper human breathing — a situation never contemplated by the framers of section 2143 when enacted. Today, however, the health of the community may well depend on such Sunday “ works ”.
No less so is the necessary vitamins and health-producing ingredients of fresh vegetables, fruit and produce. Every nutritionist will subscribe to that. Yet these were foreign to the legislative thought when this statute became law. Only recently the Long Island Farm Bureau said that the 1 ‘ quality of fresh fruits and vegetables was being threatened by the limited hours ” of work at the Hunts Point Market (N. Y. Times article, July 4, 1967). These hours are regulated by the Department of Markets which recognizes Sunday work by the produce industry.
The Legislature is beginning to realize that article 192 of the Penal Law is losing its meaning and effectiveness, in the ever-forward march of civilization. In the revised Penal Law *490 to become operative on September 1, 1967, this article will no longer appear. Wisely it has been taken out of the purely penal concept (although no change has been made in language) and placed in the General Business Law as article 2.
This move shows a trend. Each case, however, must be separately decided on its own facts (McGowan v. Maryland, supra, n. 101, p. 511; People v. Kaplan, 8 A D 2d 163). This court concludes that a practical approach must determine the question here. Had there been no progress in urban renewal by requiring the Washington Market to vacate, this defendant would have still been there, carrying on as in previous years, unmolested by police. Interference by the downtown police precinct was absent because of administrative feeling that what was being done was a work of necessity. Should the compelled move to The Bronx change that aspect? This court believes it should not. We have not reached that stage in our pluralistic society as to differentiate between the application of laws downtown and in The Bronx. There is no interruption of repose and religious liberty of anyone by defendant’s activities. On the contrary the public is generally aided by them, well within the meaningful words ‘ ‘ good order, health or comfort of the community ’ ’ of the statute.
After trial therefore, I find the defendant not guilty of the charge. All cases are similarly decided and so indorsed on the respective jackets. The motion to dismiss the complaint in each is granted.