## Department of Environmental Resources v. Warren Sand & Gravel Co., Inc.

*Gerald C. Grimaud,* for Commonwealth.

*Robert J. Trace* and *Edward Friedman,* for appellants.

BROUGHTON, Chairman of the Board: August 8, 1973.—

### ADJUDICATION

*History of the Case*

The above-captioned matters have been consolidated by agreement of the parties hereto, and, except as otherwise noted herein, all statements appearing herein apply equally to all three of the appellants.

On October 4, 1971, Warren Sand and Gravel Co.,

Inc. (hereinafter Warren) and Oil City Sand and Gravel Company (hereinafter Oil City) applied for a permit to remove sand and gravel from the bed of the Allegheny River, under the provisions of section 1908-A of The Administrative Code of April 9, 1929, P. L. 177, as amended, 71 PS §510-8. A similar application was made by Davison Sand and Gravel Company (hereinafter Davison) on November 11, 1971. On Tuesday, February 29, 1972, and Wednesday, March 1, 1972, the Department of Environmental Resources conducted a hearing at Franklin, Pa., before Jack Sheffler, a hearing examiner for the Department of Environmental Resourcès (hereinafter department), Wesley Gilbertson, Deputy Secretary of Environmental Resources, and Vaden R. Butler, Director of Dams and Encroachments, Department of Environmental Resources. The purpose of the hearing was "to receive testimony relevant to the applications in this matter to dredge sand and gravel for commercial purposes in the Allegheny River, Venango County, Pennsylvania." The hearing examiner indicated that the department would "consider testimony relevant to the issue of whether the proposed [permits] will comply with the Pennsylvania Water Reclamation Act, The Clean Streams Law and the Surface Mining Conservation and Reclamation Act" and further, that "the Department will further consider testimony relevant to the potential environmental impact of the proposed operation under section 27, Title I of the Pennsylvania Constitution." (Certain portions of the testimony presented at that hearing, it was agreed could be considered by this board as introduced before this board. The hearing examiner noted that the hearing has been publicized in the Pennsylvania Bulletin and in newspapers of general circulation in the area of the proposed projects, and appellants herein, who were

present at the hearing and represented by counsel, entered written appearances with the Department of Environmental Resources. Testimony was taken under oath, and the parties were given a right to representation by counsel and to rebuttal, but not to cross-examination. The hearing examiner indicated that "the nature of this proceeding is a fact-finding hearing; it is not an adjudicative hearing under the Administrative Agency Law." He advised the participants that, after consideration of the several applications, and the relevant testimony, the department "shall thereupon take such action as is authorized by law, which shall be contained in a written notice directed to the applicant, and which contain a written statement of available appeal procedures." Judging from the transcript of those hearings taken as a whole, and from a number of comments during the course of those hearings many participants, including some or all of the appellants herein, believed that the issue to be decided at those hearings was whether the permits applied for would or would not be granted at all.

On April 10, 1972, the Department of Environmental Resources issued executed permits for the dredging operations of Warren and Oil City, and on April 12, 1972, for Davison. The permits, identical except with respect to the identity of the parties and the location of the proposed dredging operations, consisted of the basic permit plus several pages of typewritten terms and conditions, specifying in considerable detail the manner in which dredging operations were to be conducted by the applicants.

On May 1, 1972, Warren and Oil City filed timely appeals with the Environmental Hearing Board and on May 15, 1972, Davison filed a timely notice of appeal following a 15-day extension of the appeal period granted by the then chairman of the board.

Appealed from were three of the terms and conditions, namely:

(I) Dredging shall not take place any closer than 50 feet from the shore line or from islands.

(II) Dredging shall not be permitted in the period between 6 p.m. Friday and 7 a.m. Monday, nor between 6 p.m. on the day preceding a national holiday and 7 a.m. on the day following the holiday.

(III) Dredging shall not take place in any natural and untouched areas. (Permits issued to applicants, Notice of Appeals Briefs of both parties) . . .

## DISCUSSION

Appellants object to the three conditions on two principal grounds: (1) that the department does not have authority to attach conditions to the permits, and (2) if it does, it has authority to promulgate only conditions that are reasonable.

The first issue can be disposed of easily. The statute provides, Administrative Code of April 9, 1929, as amended, supra, 71 PS §510-8:

"(3) To enter into agreements to sell, lease or otherwise dispose of any iron, coal, limestone, fire-clay, oil, gas and other minerals, except sand and gravel and minerals deposited as silt in pools created by dams, that may be found in or beneath the beds of navigable streams or bodies of water within the Commonwealth and non-navigable streams or bodies of water where the beds thereof are owned by the Commonwealth, on such terms and conditions as the board deems to be in the best interest of the Commonwealth:"

We note parenthetically that we take the words "the Commonwealth," in this statute to mean not the Commonwealth in its proprietary capacity, but the people of the Commonwealth. The authority to impose

conditions upon a sale or lease would be inherent in the power to lease, even apart from the explicit statutory authority. By analogy we note that zoning boards of adjustment may impose conditions upon the ground of a variance, and that this authority, held to be inherent in the zoning board's power, is based upon far flimsier statutory language than is the department's power. See Everson v. Zoning Board of Adjustment, 395 Pa. 168, 171, 149 A. 2d 63, (1959); Henry Jacobs v. Philadelphia Zoning Board of Adjustment, 1 Comm. 197, 273 A. 2d 746 (1971); Derr Flooring Co. v. Whitemarsh Township Zoning Board of Adjustment, 4 Comm. Ct. 341, 285 A. 2d 538 (1972). And see Bortz Coal Co. v. Commonwealth, 2 Comm. Ct. 441, 279 A. 2d 388 (1971).

We conclude that where, as here, the administering agency is given explicit authority to lease "subject to such terms and conditions as it deems in the best interests of the Commonwealth" that it does have the power to impose conditions on the lease. We are not convinced by the arguments relating to the applicability of the Commonwealth Documents Law of July 31, 1968, P. L. 769, 45 PS §1101, et seq. We do not think that law prohibits the attaching of reasonable conditions to the leases, as authorized by the leasing statute.

It remains to determine what the limits of that power are, if any.

We do think that there are limits. Even appellants conceded that the department has the authority to impose "reasonable" conditions. We agree that the department does not have the power to impose unreasonable conditions. We must define "reasonable," however.

Reasonable conditions will be defined, we think, by their having some rational relation to the purpose

of the statute authorizing leasing of mineral resources under navigable streams, and to the general purpose of the statute reenacting that power, namely, the statute that created the department, the Act of December 3, 1970, P. L. 834, 71 PS §510.1, et seq. We also think that the reenactment of the statute authorizing the leasing of mineral resources under navigable waters on December 3, 1970, must be taken to have been in contemplation of article I, sec. 27, of the Constitution of Pennsylvania, the "Environmental Declaration of Rights," which had been passed by two successive legislatures and then adopted by the electorate in May of 1970. That amendment was held by the Commonwealth Court in Commonwealth v. National Gettysburg Battlefield Tower, Inc., 8 Comm. Ct. 231, 302 A. 2d 886 (1973), to be self-executing, and we are bound by that decision. Furthermore, the part of the amendment that applies to this case is the public trust provision, as to which the comments made by Judge Mencer in his dissent, as to the lack of standards with regard to what constitutes "clean air" or "pure water," do not apply. There is ample common-law precedent extending over several centuries, regarding the definition of the duties of a trustee. See our opinion and ruling on these questions in Fox v. Department of Environmental Resources, Docket No. 73-078 (filed June 18, 1973).

There is also some hint that article I, sec. 27, as it enunciated the public trust doctrine, may have been simply declaratory of the common law as it existed prior to the enactment of article I, sec. 27: Rundle v. Delaware and Raritan Canal Co., 14 Howard 80, 55 U.S. 80 (1852).

There is no question that the bed of the Allegheny River is a publicly owned natural resource: Shrunk v. Schuylkill Navigation Co., 14 S. & R. 71 (1826).

It follows that the Commonwealth must deal with that resource as trustee. It does not follow that the sale or lease of gravel from the bed is not legal. A trustee has a duty to make the trust corpus productive. See 2 Scott, Trusts §181 (3rd ed. 1967), and the constitutional injunction to "conserve" surely includes *some* use. The trustee is, however, obligated under the trust doctrine to consider the effect of any use on the values sought to be preserved by article I, sec. 27.

We, therefore, hold that, under the phrase "such terms and conditions as [the department] deems in the best interest of the Commonwealth" includes at least conditions relating to "clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment." With respect to other factors the department did consider, under the Clean Streams Law of June 22, 1937, P. L. 1987, as amended, 35 PS §691.1, et seq., the Surface Mining Conservation and Reclamation Act of May 31, 1945, P. L. 1198, as amended, 52 PS §1396.1, et seq., and the Water Obstructions Act of June 25, 1913, P. L. 555, as amended, 32 PS §681, et seq., while these statutes might form a separate legal basis for some factors, they are mostly subsumed under the language of article I, sec. 27, of the Constitution.

We hold that under article I, sec. 27, and under the general phrase "such terms and conditions as [the department] deems in the best interests of the Commonwealth," conditions that relate to (a) water quality, (b) conservation of the resource itself, (c) allocation of the use of the resource (both the gravel deposits and the use of the river for recreation, boating, fishing, and other legitimate purposes), (d) preservation of the economic and intrinsic value of the river as a fishery, (e) the preservation of "the natural . . . values of the environment of the Upper Allegheny River Valley; and

(f) the public health and safety, generally, may legally be imposed by the department. A condition that is imposed must have some rational connection with some legitimate purpose, and the connection must be supported by substantial evidence: Administrative Agency Law of June 4, 1945, P. L. 1388, as amended, 71 PS §1710.53. Although the department may not have been obligated to produce substantial evidence to support its decision prior to acting, section 21 of the Act of December 3, 1970, P. L. 834, 71 PS §510-21, we must find substantial evidence before we uphold the department's action: Administrative Agency Law, supra, 71 PS §1710.53.

Viewed in this light, we find that there is no substantial evidence to support two of the conditions.

(I) The condition requiring that the dredging companies not dredge within 50 feet of the shore of the river or of any island was unsupported by any evidence whatever. It might be supported by safety considerations as the river is used by wading fishermen and swimmers. But there was no showing, no testimony even offered tending to show, that the difference between 25 feet of shallow water near shorelines (the distance required under the old, pre-1972 permits) and 50 feet would be at all significant in this respect. The permits do require warning signs, and there was no showing that these are inadequate for safety.

Perhaps it could be argued that the aquatic biology evidence presented relative to the undesirability of extending the area being dredged, generally, is relevant to this condition as well. That evidence related much more to the harm done by dredging lengthwise to the river than to any here by dredging closer to shore. In fact, there was some suggestion that reshaping the shore areas so that there was at least a foot of

depth at summer low water would be beneficial, rather than harmful.

One guesses that the rationale for this condition may have been related to a concern with the determining of river banks and islands. If so, there was no evidence whatever that it related to this concern.

(II) The prohibition against dredging on weekends and holidays appears to have been designed to allocate the use of the river as between dredgers and recreational users, i.e., boaters, fishermen, campers and people with weekend cottages. While this is a reasonable and legitimate purpose, it is not here supported by evidence. At most a few people object to the noise made by the dredgers, but there was some indication that they may have objected as much to the idea of dredging as to the noise.

We can undoubtedly take judicial notice of the fact that people are more likely to be using the Upper Allegheny for recreation on weekends and holidays; but we cannot take judicial notice that that use is so great that other activities on the river must cease at these times. There was no traffic count, no evidence that the dredging rigs constitute a public or private nuisance, no evidence of a decibel level, and no evidence that recreational use is so intensive that recreational use and dredging cannot coexist at the same time. There was testimony of a safety hazard created by the way in which the water flowed over the headwall above the pool made by Warren, but that appeared to be due to the way in which the dredging was being carried out, rather than due to the fact it was being carried out at the time.

In the Sunday Blue Law Cases, the United States Supreme Court held that a State may prescribe a day of rest, and may even prescribe which day that day of rest must be. See Two Guys from Harrison-Allen-

town, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L. Ed. 2d 551 (1961). Here, that does not appear to be what the Commonwealth was doing. And, in fact, it is our reading of the record that at least some of the operators do not work on Sunday now. We have some doubt whether the department would have the power to require no work on Sundays indirectly enforcing section 699.4 of The Penal Code of June 24, 1939, P. L. 872, as amended, 18 PS §4699.4, or the new Crimes Code of December 6, 1972, P. L. 1068, No. 334, 18 PS §101, et seq. But since this appears not to have been any part of the purpose of the department, and since it also appears that appellants would not object if such a condition were imposed, we do not pass on the issue.

We conclude that the condition prohibiting work on weekends and holidays is not supported by substantial evidence.

(III) The condition prohibiting dredging in any natural or untouched areas, in effect requiring appellants to stay within the confines of the pools they had already dredged, might have been based on one or more of several factors: (a) allocation of the basic resource—the river and its bottom—between different classes of users; (b) water quality; (c) the "natural . . . values of the environment" of the Upper Allegheny River valley; (d) conservation of the resource itself, including both the gravel and the river; (e) safety; (f) economics.

Aquatic biology studies were presented that convince the board that the decision of the department to impose this condition was reasonable, and supported by substantial evidence. Certainly, in long run terms, based on consideration of the allocation of the resource "in the best interest of the Commonwealth," it is reasonable for the department to decide that not

*all* of the Upper Allegheny River should be dredged. Short of that very long-term consideration (it would probably take around 400 to 500 years to dredge all 128 miles of the river), it does appear, even in the shorter run, that dredging is likely to have an adverse effect upon the fishery value of the river. Based on the allocation of the resource in terms of its value as a fishery, the department was reasonable in making the decision that the area to be dredged must be limited, at some time. While we do not accept the Bramer Study submitted by the department completely, in terms of the absolute values arrived at, it is clear that the Upper Allegheny River does have considerable value as a fishery and as a recreational resource in its natural state, and that that value, if it does not now, is likely at some time, if not at present, to be greater than the value of the gravel that can be dredged from the river.

We uphold the department's decision to limit the area to be dredged, therefore, based on substantial evidence supporting a rational connection between that limitation of area and the purposes of (a) conservation; (b) allocation of the resource as between recreational users, including fishermen, "weekend cottagers," campers, and boaters on the one hand, and dredgers on the other; (c) the preservation of some of the natural values of the environment of the Upper Allegheny River Valley.*

Appellants argued in their brief that they had been dredging for a long enough time to have acquired a vested right to continue dredging, and that the area limitation condition imposed by the department in effect put them out of business, thus effecting a taking

---

* We are not convinced, for reasons already stated, of any public safety basis supporting the decision. But this is not needed.

of property without just compensation, in contravention of the Fifth Amendment to the Constitution of the United States. We do not accept that argument. The resource is owned by the Commonwealth of Pennsylvania, as trustee for all the people, including generations yet to come: article I, section 27, Constitution of Pennsylvania. Regulation and control of access to that resource is not a taking within the meaning of the Fifth Amendment to the Constitution of the United States. See also Goldblatt v. Town of Hempstead, 369 U. S. 590 (1962), where a regulation of the Town of Hempstead, New York, of a land based gravel quarry which had the effect of putting the quarry operator out of business immediately was upheld by the United States Supreme Court, even though in that case the gravel was privately owned. This is not to say that appellants need not be fairly dealt with, obviously, they should be. But there is no taking of property involved, in a constitutional sense.

Appellants presented evidence tending to show that there were game fish in the dredged pools, and that the riffles above and below the dredged pools supported approximately the same benthic organisms and, generally, that the dredging that has occurred to date may not have been significantly harmful to the ecosystem and/or the recreational value of the Upper Allegheny. In terms of boating, it may be true that certain portions of the Upper Allegheny, as at Oil City and Franklin, have been made available to motor boating because of the existence of dredged pools; whereas the possible use of motor boats on the river, apart from those dredged pools, would have been quite minimal. In terms of the allocation of the resource, however, it must be pointed out that there are many lakes in the area, most of which are better for motor boating and water skiing, etc., than are the dredged

pools on the Allegheny. It is reasonable for the department to try to preserve the river, as a river, for those recreational pursuits that need a river, such as canoeing and river fishing, and to expect motor boaters to go to lakes.

As for the effect of the dredging on the aquatic ecosystem of the river, appellants' experts, Dr. Daniel G. Bardarik and Mr. Jon C. Alden, made a study in which they concluded that the diversity of organisms in dredged and undredged pools is really not very different. That does not say that the ecosystem is the same, however. Certainly the studies by Ronald Lee, an aquatic biologist for the fish commission, showed quite different distributions of organisms in the dredged and natural pools. Furthermore, part of the diversity index prepared for at least one of the dredged pools tested by Bardarik and Alden, the Tionesta pool, were taken along the western shore in an undredged weedbed area. Trawl hauls in the pool itself would have produced very different statistics, very different diversity indexes. Id. While there are game fish found in dredged pools, the ecosystem of the dredged pools does appear to be significantly different from the ecosystem of all undredged areas of the river that have so far been tested.

It may be true that given the area of the river so far disturbed by dredging, the effects on undredged areas are minimal comparisons of riffles above and below dredging operations. That does not necessarily mean that there is no effect whatever, nor does it mean that dredging can be continued indefinitely without an adverse effect. As Aldo Leopold said in A Sand Court Almanac, 257-8 (1971), "Ecology knows of no density relationship that holds for indefinitely wide limits." The department's testimony was that the riffles are necessary, and that if too many of the riffles are

destroyed, if the pool-to-riffle ratio gets significantly larger, then the entire ecological structure of the river will change. Substituting an "artificial riffle" at the head of a dredged pool does not make up for the loss of a natural riffle. Undoubtedly, there will then be some fish, but there will be different kinds of fish.

How many riffles have to be destroyed, how many deep pools, as distinguished from the natural shallow pools, have to be created before the overall balance of the river changes over to a different ecological structure, we cannot say. It has, if we accept the conclusion of the Bardarik and Alden study, not happened yet. But the balance will, predictably, be tipped at some time, with some quantum of dredging.

We hold that the Commonwealth is reasonable in deciding to limit the area to be dredged, prior to the time that balance is tipped.

The disposition of this case is not quite so simple as the above would appear to make it, however. As we studied the transcript and the entire record, including exhibits, motions, and other docket entries, it became obvious that there were really two issues involved in the decision whether or not to impose the area-limitation condition. One issue is the decision whether or that, as it turned out, it should at some time be imposed. The second issue is when it should be imposed.

Our holding, above, relates only to the reasonableness of the department's decision that the area to be dredged should be limited at some time. With respect to the issue of *when* that limitation should be imposed, there is very little to suggest the department is either right or wrong.

The evidence does indicate that additional dredging is likely to be harmful, so perhaps a decision to limit the area to be dredged immediately cannot be called

unreasonable. On the other hand, there is evidence that there is or will be an undesirable economic impact on the dredging companies, their employes, their customers, especially PennDOT, and on the communities in which the employes of the dredging companies live, and that that economic impact is related very much to whether the condition is imposed immediately or is postponed during some transition period.

The department argued strenuously that economic impact is irrelevant to the decision of the board, and implicitly to the decision of the department.

We disagree. When the statutory authority is for the department to impose "such terms and conditions as [it] deems in the best interest of the Commonwealth," we do not see how economic impact can be excluded, *as one factor to consider.* See also Bortz Coal Co. v. Commonwealth, supra, 2 Comm. Ct. 441, 460-461, 279 A. 2d 388, 399 (1971). Relative to the long run decision, economic factors appear to have been considered, and they certainly support that decision. Relative to the short run decision, when the area limitation condition should be imposed, we see no evidence that economic factors were considered; and indeed, since the department asserts they are irrelevant, perhaps they were not.

Were we to reverse entirely on this ground, it would imply we were able to perform the balancing tests that the department should have performed. It would imply, for example, that we were able to decide just how much deterioration of the fishery ought to be balanced out against how much adverse economic impact of an immediate area limitation.

We cannot do that. And if we did do it, on the basis of the record before us, our decision would not be supported by substantial evidence. There was simply not

enough evidence to sufficiently give us any quantitative yardstick of the risk to which the river will be put by further dredging, to compare that risk to the economic problems connected with an immediate application of the area-limitation condition. We know, for example, that dredging a natural pool is less harmful than dredging a natural riffle, but we do not know how much less; nor do we know whether any of the appellants is just downstream from a natural pool or just downstream from a natural riffle. We know that there are going to be transition problems as the dredgers, and/or their customers, shift over from a river source of aggregate to a land source or to a mixed land and river source. We do not know the magnitude of those problems, the nature of the impact on highway construction programs and on other building projects. In short we do not have a basis for making the decision.

We do, however, hold that it is error for the department not to have included economic impact, regarding the public, primarily, and not simply the private impact on appellants, as one factor in its decision making process with respect to the timing of the imposition of the area limitation condition. Since that factor was not considered and must be, we remand to the department to reconsider the timing of the imposition on the area limitation condition in light of that factor, along with those factors the department has already considered. . . .

## ORDER

And now, August 8, 1973, the board remands the case to the department and orders that the permit issued upon application by any of appellants for a permit, shall not contain a condition prohibiting dredging within any distance greater than 25 feet of the shore of the river or of any island, and shall not contain a condition prohibiting dredging on weekends

and holidays. Such permits may contain a condition prohibiting dredging in any natural and untouched areas, but before such condition is imposed the department shall consider the economic impact of the timing of the imposition of such condition as balanced with other relevant factors discussed in this adjudication. Such decision shall be made within 30 days of this order. While the department is making the decision, appellants shall not dredge any natural and untouched areas, unless specially permitted by the department and if it can be done with any reasonable confidence that permanent harm to the recreational and/or fishery value of the river is minimal, compared with the economic impact, the board strongly recommends that such special permission be granted. That decision, like other actions of the department, is appealable to this board.

It is further ordered that when the 12-month study referred to in finding of fact no. 56 is completed, the department shall take a second look at the necessity for restricting dredging to existing dredged pools, both with respect to the ultimate basis for such a restriction and with respect to the timing of the imposition of that restriction. The results of the 12-month study and of that "second look" shall be submitted to this board.